# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CARETOLIVE, a not for profit
corporation, )
)
)
Plaintiff, )
)
v. )          **Case Number 1:07-MC-00316**
)          **Honorable Royce C. Lamberth**
ANDREW VON ESCHENBACH, )
Commissioner of the FDA, et al., )
)
Defendants. )
)

## OPPOSITION OF NON-PARTY JOURNALIST PAUL GOLDBERG DBA THE CANCER LETTER TO PLAINTIFF CARETOLIVE'S PETITION TO ENFORCE SUBPOENA

Paul Goldberg dba The Cancer Letter respectfully submits this opposition to the petition of Plaintiff CareToLive's ("Plaintiff" or "CareToLive") to enforce its Subpoena. For the reasons set forth below, Plaintiff's petition should be denied.

## INTRODUCTION

The pleading denominated "Petition to Enforce Subpoena" relates to two subpoenas issued by CareToLive to Mr. Paul Goldberg, dba The Cancer Letter. The Cancer Letter is an award-winning newsletter that reports on cancer related developments in the pharmaceutical and biotechnology industry, the Food and Drug Administration and the National Institutes of Health. CareToLive's subpoenas seek production of documents relating to the identity of The Cancer Letter's sources for published stories and a request for inspection of The Cancer Letter's premises



RECEIVED

AUG 2 2 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

As set forth in more detail below, there are a number of reasons that CareToLive's petition to enforce those two subpoenas should be denied.

## FACTS

The Cancer Letter was founded in 1973 by journalist Jerry D. Boyd, two years after the U.S. Congress passed the National Cancer Act of 1971. Paul Goldberg joined The Cancer Letter in 1986. His reporting on the pharmaceutical and biotechnology industry, FDA, and practitioners of unconventional therapy has been recognized by the Washington DC Professional Chapter of the Society of Professional Journalists, the Gerald Loeb Awards, and the Newsletter and Electronic Publishers Foundation. He is the only reporter to receive three Robert D.G. Lewis Watchdog Awards from the Washington chapter of SPJ.

On August 2, 2007, CareToLive's counsel, Mr. Donahue sent the two subpoenas at issue to Mr. Goldberg's office by facsimile. Exhibit 1. On August 3, Mr. Donahue emailed Mr. Goldberg indicating that he would have the second subpoena hand served. He stated that "if we do not resolve the issue very soon that I shall make flight reservations and shall be at your office at 10:30 a.m. on August 13, 2007. I will be bringing my computer expert with me." Exhibit 2.

On August 5, a Sunday, Mr. Goldberg left Washington, D.C. to go on a long-planned vacation with his wife. (The vacation had been planned long before Mr. Goldberg first heard from Mr. Donahue.) Later that day, a process server asked for the Goldbergs at their home and was informed by their seventeen year old daughter that they were away.

On August 5, Mr. Donahue sent Mr. Goldberg an email asking "why are you fighting this so hard" and indicating again that he was coming "to search your business" on Monday and "there will be cameras there." Exhibit 3. He sent another email later that same day, accusing

Mr. Goldberg of having his daughter lie for him and indicating that the process server would be "knocking on your door all night." Exhibit 4.

On August 6, the first business day after CareToLive attempted to serve the subpoenas, The Cancer Letter's counsel, Steven Lieberman, wrote to Mr. Donahue informing him that (1) Mr. Goldberg and The Cancer Letter were represented by counsel, (2) Mr. Goldberg was away on a long-planned vacation and (3) when Mr. Goldberg returned from vacation Mr. Lieberman would be willing to accept service on his behalf at that time. Exhibit 5. Mr. Lieberman also informed Mr. Donahue that no inspection would be occurring on August 13 and asked that Mr. Donahue comply with Rule 45.

In response to Mr. Lieberman's letter, Mr. Donahue left a voicemail message that day admitting that "I know we haven't served him properly" and accusing Mr. Goldberg of "hiding out in his basement trying to avoid Federal subpoenas." Exhibit 6. He also indicated that he would be in Washington, D.C. on August 13 and "there will be a lot of press people right behind me." Id.[1]

Mr. Lieberman then wrote Mr. Donahue a letter reiterating that Mr. Goldberg was on a long-planned vacation and that Mr. Donahue needed to comply with Rule 45. Mr. Lieberman further informed Mr. Donahue that Mr. Goldberg and The Cancer Letter would be asserting Rule 45 objections to the subpoenas. Exhibit 8. In response, Mr. Donahue sent an email indicating that the alternative to Mr. Goldberg giving him the information he sought is to "depose him and subpoena him to all the hearings" and that Mr. Goldberg was "going to force us to make him a party to this litigation." Exhibit 9.

---

[1]    Mr. Donahue's continuing threats to appear at the Goldberg's home on August 13 were of particular concern because Mr. Donahue has been convicted of criminal trespass, a conviction that was upheld on appeal. See Exhibit 7.

On August 10, Mr. Donahue again emailed indicating that because Mr. Goldberg and The Cancer Letter "have been so non cooperative please tell them that I have decided I need to take both their depositions" and after those depositions "we shall decide whether to amend our complaint to add them as Defendants." Exhibit 10. In another August 10 email, Mr. Donahue wrote that he considered Mr. Goldberg and The Cancer Letter to "be in contempt of court" and opined that because "the subpoena requested documents to be produced in Ohio, Mr. Goldberg would need to appear in Ohio to show cause." Exhibit 11.

On August 10, the Goldbergs and The Cancer Letter served Mr. Donahue with Rule 45 objections to the subpoenas. Exhibit 12.

## I.    PLAINTIFF HAS FAILED TO COMPLY WITH THE FEDERAL RULES OF CIVIL PROCEDURE

Rule 45 makes plain the obligation of parties to respect the rights of third parties and avoid using the subpoena process to impose undue burden or expense. Fed. R. Civ. P. 45(c)(1). For at least three separate and independent reasons, counsel for Plaintiff CareToLive has disregarded this obligation throughout the interactions with Mr. Goldberg and The Cancer Letter.

First, Rule 45 requires that a party personally serve a subpoena on a third party. See Fed. R. Civ. P. 45(b)(1). CareToLive has not done so and has ignored repeated communications informing Mr. Donahue that Mr. Goldberg was not in town to accept service. Mr. Goldberg and The Cancer Letter have offered to accept service, either through counsel or at the Goldberg's home, but only after the Goldberg's vacation. CareToLive has not been willing to extend this reasonable accommodation and has failed to properly serve the subpoenas.[2] Interestingly, the "service" described in CareToLive's "Supplemental Memorandum" was not proper because, as

---

[2]    CareToLive has also purported to issue but failed to properly serve other subpoenas, but we deal herein only with the two subpoenas that were attached to the Petition to Enforce Subpoenas.

counsel has previously informed CareToLive's counsel, the individual to whom the subpoena was handed was a neighbor of Mr. Goldberg, not a resident of the house.

Second, the subpoenas that CareToLive seeks to enforce are issued from the wrong court. Fed. R. Civ. P. 45(b)(2) is clear that a subpoena issued from the Southern District of Ohio cannot be served in the District of Columbia. Nor can a subpoena served in the District of Columbia require the production of documents in Ohio. This problem is not simply an oversight. Mr. Donahue is asserting that as a result of the subpoena being issued from Ohio, he is entitled to enforce the subpoena in Ohio. See Exhibit 11.

Third, the lawsuit in which the subpoena was purportedly served was only filed on July 30, 2007. Because it is a suit against the government, the answer is not due for another 45 days. Plaintiff has filed no motion for temporary restraining order or preliminary injunction. Pursuant to Rule 26(d), Plaintiff is barred from taking discovery until after the Rule 26(f) conference occurs. See Fed. R. Civ. P. 26(d).

The issue of timing is particularly important here because the FDA has numerous legal defenses that will be raised in its initial response to CareToLive's complaint and that case is unlikely to actually proceed to fact discovery. The basic legal theory of the complaint is an alleged constitutional violation based on denial of therapy to the terminally ill. See Exhibit 13. Just such a theory has recently been rejected by the United States Court of Appeals for the District of Columbia Circuit sitting en banc. See Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach, No. 04-5350, 2007 U.S. App. LEXIS 18688 (D.C. Cir. August 7, 2007). Mr. Goldberg and The Cancer Letter should not be burdened with defending against these subpoenas, and dealing with the complex legal issues involved, when it appears unlikely that CareToLive will be permitted to conduct discovery at all in the underlying matter.

appears unlikely that CareToLive will be permitted to conduct discovery at all in the underlying matter.

Fourth, in addition, CareToLive's subpoenas are on their face unreasonably broad in scope and designed to harass a third party. Contrary to the assertion that CareToLive is only seeking a few pieces of paper, the subpoenas are sweeping in scope and, indeed, seek to conduct an "inspection" of Cancer Letter's offices. Such broad requests are contrary to the obligation CareToLive has to minimize the burden on third parties.

## II.    PLAINTIFF HAS FAILED TO ESTABLISH THAT IT IS ENTITLED TO THE DISCOVERY SOUGHT FROM A PROFESSIONAL JOURNALIST

CareToLive's subpoenas seek two categories of relief: production of all phone records, emails or other communications between Mr. Goldberg and "any federal employees" and inspection of The Cancer Letter offices. The target of these subpoenas is the identity of The Cancer Letter's sources for certain articles written about the approval process for the prostate cancer drug Provenge.

The law in the District of Columbia is clear that a party seeking discovery of journalistic sources must overcome a qualified privilege. See Lee v. Department of Justice, 413 F.3d 53, 59 (D.C. Cir. 2005); Zerilli v. Smith, 656 F.2d 705 (D.C. Cir. 1981). First and foremost, District of Columbia law requires that a party first "exhaust every reasonable source for" the information from non-journalistic sources. See Lee, 413 F.3d at 59. That, CareToLive has not even begun to do. Nor has CareToLive shown that the information sought is at the heart of its case against the FDA as is required to overcome the qualified privilege. See id. Because the Petition to Enforce Subpoena is not enforceable for all the reasons set forth in Section I and CareToLive has not made any argument in its Petition seeking to overcome the qualified privilege, Mr. Goldberg and The Cancer Letter are not addressing these issues in full herein. Should the Court entertain

6

argument from CareToLive on overcoming the privilege, Mr. Goldberg and The Cancer Letter respectfully request the opportunity to submit further briefing thereon.

## III.    MR. GOLDBERG AND THE CANCER LETTER ARE ENTITLED TO RULE 45(c)(1) RELIEF

As set forth herein, Mr. Goldberg and The Cancer Letter have been forced by CareToLive's counsel to incur substantial expense to respond to this Petition. Despite being informed on several occasions of the infirmities of his subpoenas, CareToLive's counsel has refused to correct those infirmities or to accept the reasonable suggestion that the issue be tabled at least until the Goldberg's return from vacation.

Mr. Donahue further failed to comply with his obligations under Rule 45 by posting to an internet chat site a description of his efforts to have the Goldbergs served in which he accused the Goldbergs of leaving town to avoid service of process, stating (falsely) that they "hid in their basement and refused to answer their door" and asserting that "the Goldberg family is full of three generations of liars." Exhibit 14. (To be very clear, Mr. Donahue, acting as an officer of the Court, had posted on a fund-raising website that a non-party's minor child is a liar.) According to another website, Mr. Donahue stated that he had posted this information because the litigation "is going to be expensive and needs to be funded" and by creating some excitement "this might help CareToLive to raise more funding." Exhibit 15. Having admitted that this entire episode is part of a strategy to help CareToLive's fundraising, Mr. Donahue has run so far afoul of his obligations under Rule 45 that sanctions are warranted.

## **CONCLUSION**

For the reasons set forth herein, Mr. Goldberg and The Cancer Letter respectfully request

that the Petition to Enforce Subpoenas be denied and that they be awarded reasonable attorneys

fees pursuant to Rule 45(c)(1).

Date: August 22, 2007                    Respectfully submitted,


Steven Lieberman
Sharon L. Davis
ROTHWELL, FIGG, ERNST & MANBECK, P.C.
1425 K Street, N.W., Suite 800
Washington, D.C.  20005
Tel: (202) 783-6040
Fax: (202) 783-6031

*Counsel for Non-Party Journalist, Paul Goldberg
DBA The Cancer Letter*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the following

**OPPOSITION OF NON-PARTY JOURNALIST PAUL GOLDBERG DBA**

**THE CANCER LETTER TO PLAINTIFF CARETOLIVE'S PETITION TO ENFORCE**

**SUBPOENA** was served this 22nd day of August, 2007 by First Class, U.S Mail, postage pre-

paid on the following counsel for Plaintiff:

> Kerry M. Donahue
> Bellinger & Donahue
> 6295 Emerald Parkway
> Dublin, Ohio 43106

Patrick Collares

6295 Emerald Parkway
Dublin, Ohio  43016
614-761-0402
614-789-9866

**Bellinger & Donahue**
**Attorneys at Law**



| **To:** | Paul Goldberg | **From:** | Kerry Donahue, Esq. |
|---|---|---|---|
| **Fax:** | 202-318-4030 | **Pages:** | 6 |
| **Phone:** | | **Date:** | 8/02/07 |
| **Re:** | Provenge-caretolive litigation | **cc:** | |

Scott P. Bellinger
Kerry M. Donahue*
*Also admitted in Florida

# BELLINGER & DONAHUE

### Attorneys At Law

6295 Emerald Parkway
Dublin, Ohio 43016
Office 614-761- 0402
Fax 614-789- 9866

August 2, 2007

**BY FACSIMLE AND REGULAR US MAIL**

RE: CareToLive v. FDA litigation, Federal Case No. 2:07 CV 729

Paul Goldberg
Cancer Letter
PO BOX 9905
Washington, DC 20016

Dear Paul Goldberg,

Enclosed please find two subpoenas. If necessary the second one will be personally served upon you.  If you comply with the first one the second one might become moot.

If your source is any federal employee (Scher, Flemming and Hussain would all be considered government employees then you have no legitimate "protect the source" argument.  I don't think the "protect the source" argument will work anyways but if it is government it is coming from you particularly do not have an argument.

I am willing to work with you on this.

Sincerely,

Kerry Donahue

AO88 (Rev. 12/06) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

Southern _____     DISTRICT OF     Ohio _____

CareToLive, a not for profit corporation
                                          V.

Andrew von Eschenbach, Commissioner
of the FDA et al.,

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]  2:07 CV 729

TO: Paul Goldberg
    DBA Cancer Letter
    PO BOX 9905
    Washington, DC 20016

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
| --- | --- |
|  |  |
|  | DATE AND TIME |
|  |  |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
| --- | --- |
|  |  |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects): All phone records, e-mails or other munications between your self and any federal employees including but not limited to Maha ssain, Howard Scher, Thomas Flemming. Also the envelope or cover letter or any other mmunication that accompanied the letters from Hussain, Scher and Flemming.

| PLACE | DATE AND TIME |
| --- | --- |
| 6295 Emerald Parkway, Dublin, Ohio 43016 | August 6, 2007 at noon |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
| --- | --- |
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
| --- | --- |
| _counsel for Plaintiff CareToLive_ | 8-2-07 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Kerry M. Donahue, 6295 Emerald Parkway, Dublin, Ohio 43016  (614) 761-0402

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                    DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject

to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

%AO88 (Rev. 12/06) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

Southern
_____    DISTRICT OF    Ohio

CareToLive, a not for profit corporation
V.

Andrew von Eschenbach, Commissioner
of the FDA et al.,

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]  2:07 CV 729

TO:  Paul Goldberg
     DBA Cancer Letter
     PO BOX 9905
     Washington, DC 20016

☐ **YOU ARE COMMANDED** to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐ **YOU ARE COMMANDED** to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☐ **YOU ARE COMMANDED** to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

| PLACE | DATE AND TIME |
|---|---|

☒ **YOU ARE COMMANDED** to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| Cancer letter offices, Washington DC | August 13, 2007 10:30 a.m. |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| _[signature]_  Counsel for Plaintiff CareToLive | 8-2-07 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Kerry M. Donahue, 6295 Emerald Parkway, Dublin, Ohio 43016  (614) 761-0402

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED |  |  |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
               DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject

to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

**Subject: \*\*JUNK\*\* Paul**

Re 2:07 CV 729, CareToLive v. FDA,

Paul

I have not heard back from you or your attorney.

Therefore I must proceed as planned. I plan to have the second subpoena hand served upon you in the next day or two, it will be as previously faxed to you.

Please be advised that if we do not resolve the issue very soon that I shall make flight reservations and shall be at your office at 10:30 A.M. August 13, 2007. I will be bringing my computer expert with me. Once I have booked a non-refundable flight then the matter can not be resolved since at that time I will just want to see it all.

If I do not hear other wise I will see you then so that we can review all files and computers in your office that might be relevant to this matter or which might lead to other evidence relevant to this matter.

I would respectfully suggest that the matter could be worked out a bit easier if you would cooperate and provide us the documents per the first subpoena I sent you.

Thanks.

Kerry M. Donahue

BELLINGER AND DONAHUE, ATTORNEYS AT LAW

6295 Emerald Parkway

Dublin, Ohio 43016

(614) 761-0402


Get a sneak peek of the all-new AOL.com.

8/3/2007

**Debora O. Braxton**

| | |
|---|---|
| **From:** | Steven Lieberman |
| **Sent:** | Monday, August 06, 2007 7:24 AM |
| **To:** | Sharon Davis |
| **Cc:** | Debora O. Braxton |
| **Subject:** | Fw: Fwd: Paul, talk to me. |

```
Steven Lieberman
Rothwell, Figg, Ernst & Manbeck. P.C.
1425 K Street, N.W.; Suite 800
Washington, DC 20005
Phone: 202-783-6040; Fax: 202-783-6031
e-mail: slieberman@rothwellfigg.com

web: http://www.rothwellfigg.com
```

The content of this e-mail may be privileged and confidential and is intended only for the identified individual or entity. If you are not the intended recipient or are not responsible for passing this e-mail to the intended recipient, then you are hereby notified that any use, copying, dissemination or distribution of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify Rothwell, Figg, Ernst & Manbeck, P.C. immediately by telephone at (202) 783-6040, by fax at (202)783-6031, or by e-mail at slieberman@rothwellfigg.com. You should not read this e-mail, and it should be deleted.

```
----- Original Message -----
From: Paul Goldberg <paul@cancerletter.com>
To: Steven Lieberman
Sent: Sun Aug 05 22:00:19 2007
Subject: Fwd: Paul, talk to me.
```

Begin forwarded message:

> From: BeDonWahoo@aol.com
> Date: August 5, 2007 1:37:44 PM EDT
> To: paul@cancerletter.com
> Subject: Paul, talk to me.

Paul

Why are you fighting this so hard.  You know we are going to get the information we are looking for sooner or later.

The only reason I can think of for you to make us have to come to your office and go through all your records next Monday is because you want media exposure out of it.  Is it because you know that if we come to search your business next Monday and that there will be cameras there?  Is it pubilcity for your publication that you desire?

Work with me on this and lets do it the easy way rather then the hard way.

Kerry

Get a sneak peek of the all-new AOL.com.

**Debora O. Braxton**

| | |
|---|---|
| **From:** | Steven Lieberman |
| **Sent:** | Monday, August 06, 2007 7:25 AM |
| **To:** | Debora O. Braxton |
| **Subject:** | Fw: Fwd: **JUNK** Paul |

```
Steven Lieberman
Rothwell, Figg, Ernst & Manbeck. P.C.
1425 K Street, N.W.; Suite 800
Washington, DC 20005
Phone: 202-783-6040; Fax: 202-783-6031
e-mail: slieberman@rothwellfigg.com
```

web: http://www.rothwellfigg.com

The content of this e-mail may be privileged and confidential and is intended only for the identified individual or entity. If you are not the intended recipient or are not responsible for passing this e-mail to the intended recipient, then you are hereby notified that any use, copying, dissemination or distribution of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify Rothwell, Figg, Ernst & Manbeck, P.C. immediately by telephone at (202) 783-6040, by fax at (202)783-6031, or by e-mail at slieberman@rothwellfigg.com. You should not read this e-mail, and it should be deleted.

```
----- Original Message -----
From: Paul Goldberg <paul@cancerletter.com>
To: Steven Lieberman
Sent: Sun Aug 05 21:59:30 2007
Subject: Fwd: **JUNK** Paul
```

Begin forwarded message:

```
    From: BeDonWahoo@aol.com
    Date: August 5, 2007 12:52:48 PM EDT
    To: paul@cancerletter.com
    Subject: **JUNK** Paul
```

    Paul

    Sending your daughter to the door to lie for you???  That's kind if a new low isn't
it.

    Your going to get served sooner or later...do you really want them knocking on your
door all night.  Accept the inevitable. ...answer your door.

    Kerry

    Get a sneak peek of the all-new AOL.com.

1

 ROTHWELL, FIGG. ERNST & MANBECK, P.C.

1425 K Street, N.W.
Suite 800
Washington, D.C. 20005

Telephone 202-783-6040
Facsimile 202-783-6031
www.rfem.com

G. Franklin Rothwell
E. Anthony Figg
Barbara G. Ernst
Harry F. Manbeck, Jr.
George R. Repper
Steven Lieberman
Joseph A. Hynds
Richard Wydeven
Martin M. Zoltick
Minaksi Bhatt
Sharon L. Davis
Robert B. Murray
Jeffrey L. Ihnen
Glenn E. Karta
Martha Cassidy, Ph.D.
Brian S. Rosenbloom
Jason M. Shapiro

*Not Admitted in D.C.

Anne M. Sterba
Lisa N. Phillips
C. Nichole Gifford
Patrick T. Skacel
Monica C. Kitts
Brian A. Tollefson
Joo Mee Kim
R. Elizabeth Brenner-Leifer
Adam M. Treiber
Daniel L. Shores
Joseph E. Green
John A. Evans, Ph.D.
Thomas D. Lyford
Oliver L. Edwards*
David B. Orange

Of Counsel
John A. McCahill
Brian E. Banner

August 6, 2007

*By E-mail*

Kerry Donahue, Esq.
Bellinger & Donahue
6295 Emerald Parkway
Dublin, Ohio 43016

Re:     <u>CareToLive v. von Eschenbach, et al.</u>

Dear Mr. Donahue:

This firm represents "Paul Goldberg d/b/a The Cancer Letter" in connection with the subpoenae issued over your name dated August 2, 2007.

Neither subpoena has been properly served on Mr. Goldberg or on The Cancer Letter and thus my client will not be responding to either subpoena. Should you effect proper service, then my clients will respond in accordance to Fed. R. Civ. P. 45. You should be aware that my clients intend to assert all applicable objections (including all applicable privileges). Since Mr. Goldberg and The Cancer Letter are represented by counsel, any further communication with them (other than service of a subpoena) should only be through me.

I would appreciate it if you could provide me with a courtesy copy of any subpoena that you serve. Please do not misinterpret this request as advice that I am accepting service on behalf of my clients. I am not.

Mr. Goldberg has forwarded to me the threatening e-mail messages that you sent to him yesterday afternoon and evening. You are now instructed not to communicate any further with Mr. Goldberg or members of his family – including the minor child that you have accused of lying. Mr. Goldberg is away on a long planned (that is long before your ridiculous subpoenas were issued) vacation. At this point in time one of his minor children is alone in their home. If you send a process server again to that house, we will call the police. When Mr. Goldberg returns from vacation, I will then discuss with you whether we would be willing to accept service at that point in time on behalf of Mr.

ROTHWELL, FIGG, ERNST & MANBECK, P.C.

Kerry Donahue, Esq.
Bellinger & Donahue
August 6, 2007
Page 2

Goldberg. Any further communications directed to my client will be referred to the appropriate disciplinary panel.

Mr. Goldberg has also forwarded to me your e-mail of August 3 threatening to show up in his offices on August 13 with a computer expert "so that [you] can review all files and computers in [his] office that might be relevant to this matter or which might lead to other evidence relevant to this matter." I will provide you now with two comments on your letter. First, do not plan on showing up on August 13, 2007. Neither you nor your expert will be admitted since, *inter alia*, you have not properly served the subpoena on Mr. Goldberg. Second, please read Rule 45 of the Federal Rules of Civil Procedure which sets forth the procedures applicable to a subpoena directed to a non-party – procedures that your communications with Mr. Goldberg ignore.

Very truly yours,

*Steven Lieberman /sxd*

Steven Lieberman

SL:dob
cc:     Mr. Paul Goldberg

1420082_1

*Attorney Work Product*
*Privileged and Confidential*



ROTHWELL, FIGG, ERNST & MANBECK, P.C.

## MEMORANDUM

| | |
|---|---|
| To: | File |
| From: | Steven Lieberman |
| Date: | August 6, 2007 |
| Re: | Transcript of Voicemail from Kerry Donahue |

---

Hi Steve, Kerry Donahue, returning your phone call. I got your letter and, of course, I know we haven't served him properly. Your client has been hiding out in his basement trying to avoid Federal subpoenas, which is fine. But, you know, we're going to get him served and I'm going to get him served before Monday. I was trying to give him a courtesy by giving him some advanced notice but we will have him served before Monday and I will be there on Monday to look at these documents. I wanted to try to work with him on getting these documents. I know if I come there on Monday there is a potential that it will get out to the press and that there will be a lot of press people right behind me. I wanted to avoid that kind of thing for Mr. Goldberg. He's obviously got some information he's intent on protecting. We think he has no right to protect those, in fact, he's probably, he's probably got evidence of a crime committed by Federal employees which are not my business as much as others. But, he certainly can't protect that kind of information and who it came from. I'd be glad to work with you guys, talk to you guys about getting this information. Otherwise, I'm going to get this subpoena served and I will be there next Monday. If need be, I will get the court's assistance on gaining access next Monday. But, he will be served. He can't hide in his basement forever. 614-761-0402. Thanks Mr. Lieberman. Bye.

[Cite as *State v. Donahue*, 2005-Ohio-1478.]

COURT OF APPEALS
FAIRFIELD COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| STATE OF OHIO | : | JUDGES:<br>Hon: W. Scott Gwin, P.J. |
|  | : | Hon: William B. Hoffman, J. |
| Plaintiff-Appellee | : | Hon: John W. Wise, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 2004-CA-20 |
| KERRY M. DONAHUE | : |  |
|  | : |  |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:     Criminal appeal from the Lancaster
Municipal Court, Case No. 2003CRB01625

JUDGMENT:     Affirmed

DATE OF JUDGMENT ENTRY:     March 25, 2005

APPEARANCES:
For Plaintiff-Appellee

RANDALL T. ULLUM
121 East Chestnut Street
Lancaster, OH 43130

For Defendant-Appellant

KERRY M. DONAHUE  Pro Se
MICHAEL MOROCO
6065 Frantz Road, Suite 106
Dublin, OH 43017

*Gwin, P.J.*

{¶1}  Defendant-appellant Kelly M. Donahue appeals from his conviction and sentence in the Lancaster Municipal Court on one count of criminal trespass under Pickerington Municipal Code Section 642.10 (A) (2), a misdemeanor of the fourth degree. The plaintiff appellee is the State of Ohio.

{¶2}  On June 20, 2003, Commander Stephen H. Annetts of the City of Pickerington Police Department was working special duty for the BIA (Building Industry Association of Central Ohio) at the Parade of Homes in Pickerington, Ohio.   The property was contractually in the control of the BIA and private security and local law enforcement were hired by the BIA to control traffic and enforce the rules and regulations established by the BIA for the Parade of Homes.

{¶3}  Commander Annetts observed a vehicle with a worker pass in the windshield.   He waived the vehicle into the designated work parking area. As the occupants of the vehicle approached him, he saw that they had V.I.P. passes to the Parade of Homes.   Due to a large number of vendors involved in the show, considerable rain, and high attendance at the show, worker parking was scarce.

{¶4}  Commander Annetts approached the group and asked to see the worker pass in order to confirm that they were working and entitled to worker parking. No one could produce a worker pass, although appellant's wife allegedly had one in the car. Commander Annetts determined that they were not working, pointed out the signs regarding parking, and asked them to move the car to general parking. Appellant disagreed and informed the officer that he believed that he had the right to park in the worker parking location.   Commander Annetts informed appellant on 2 or 3 occasions

that he needed to move the vehicle or leave the Parade of Homes. Appellant indicated to the officers that he had a right to park there and he had done nothing wrong.

{¶5}  Commander Annetts testified that he was following appellant to make sure he left the premises, but appellant stopped, turned around, and told Commander Annetts he had no right to make him leave the show. Commander Annetts testified that appellant was defiant and arrogant.

{¶6}  After refusing several requests to move the car or leave the premises, Commander Annetts informed appellant that he was under arrest for disorderly conduct.

{¶7}  Appellant was cited in Pickerington Mayor's Court for one count of Persistent Disorderly Conduct on June 30, 2003, where he pled not guilty and executed a time waiver. The case in Mayor's Court was subsequently dismissed and the charges were re-filed in Lancaster Municipal Court on August 19, 2003. The appellant was charged in Municipal Court with one count of Persistent Disorderly Conduct and two counts of Criminal Trespass. On September 5, 2003 and October 8, 2003, appellant filed two separate motions to dismiss. The trial court overruled both motions on November 10, 2003. On November 12, 2003, appellant executed a time waiver.

{¶8}  A jury trial was held on February 17, 2004. At the conclusion of the trial the trial court granted appellant's Crim. R. 29 motions for acquittal on the count of disorderly conduct and one count of criminal trespass. The second count of criminal trespass was sent to the jury. Upon completion of their deliberations, the jury found appellant guilty of one count of criminal trespass. The trial court deferred sentencing and ordered a pre-sentence investigation report. The trial court sentenced appellant to 30 days in jail and placed him on probation for two years. The court suspended the 30-

day jail sentence.   The court further ordered appellant to perform 120 hours of community service and to pay a fine of $200.

{¶9}  Appellant timely filed the instant appeal and raises the following nine assignments of error for our consideration:

{¶10} "I. THE LOWER COURT ERRED BECAUSE IT DID NOT HAVE JURISDICTION TO CONSIDER THIS MATTER AND VIOLATED CRIMINAL RULE 3."

{¶11} "II. THE LOWER COURT VIOLATED THE DEFENDANTS RIGHT TO SPEEDY TRIAL.

{¶12} "III. THE COURT VIOLATED THE DEFENDANTS RIGHT TO DUE PROCESS AND EQUAL PROTECTION OF THE LAW BY ALLOWING IMPROPER EVIDENCE AND BY NOT ALLOWING THE DEFENDANT TO INTRODUCE RELEVANT EVIDENCE.

{¶13} "IV. THE FINDING THAT DEFENDANT WAS GUILTY OF TRESSPASS [SIC] WITH EVIDENCE WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶14} "V. THE DENIAL OF DEFENDANTS MOTION TO DISMISS WAS AGAINST THE SUBSTANTIAL WIEGHT [SIC] OF THE EVIDENCE.

{¶15} "VI. THE LOWER COURT VIOLATED THE DEFENDANTS RIGHT TO DUE PROCESS AND EQUAL PROTECTION UNDER THE LAW WHEN IT DENIED DEFENDANTS MOTION FOR A BILL OF PARTICULARS.

{¶16} "VII. THE LOWER COURT VIOLATED THE DEFENDANTS RIGHT TO DUE PROCESS, EQUAL PROTECTION UNDER THE LAW, AND FUNDAMENTAL FAIRNESS WHEN IT GAVE THE JURY A PROMPT TO REACH A VERDICT

WITHOUT A DISCUSSION AND OR APPROVAL BY COUNSEL OR DEFENDANT AND GAVE IMPROPER JURY INSTRUCTIONS AND FAILED TO GIVE REQUESTED INSTRUCTIONS.

{¶17} "VIII. THE JUDGE ABUSED HIS DISCRETION WHEN HE SENTENCED THE DEFENDANT TO 2 YEARS OF PROBATION AND 120 HOURS OF COMMUNITY SERVICE.

{¶18} " IX. SELECTIVE PROSECUTION."

I.

{¶19} In his First Assignment of Error, appellant maintains that the trial court lacked jurisdiction to proceed because the complaint was filed in violation of Crim. R. 3. Specifically, appellant argues that the officer who filed the complaint against appellant did not have personal knowledge of the facts which gave rise to the complaint. We disagree.

{¶20} The purpose of a criminal complaint is to inform the accused of the crime for which he is charged. *State v. Villagomez* (1974), 44 Ohio App.2d 209, 211, 337 N.E.2d 167. The complaint forms the essential basis of the court's jurisdiction and the subsequent trial and judgment. Id.

{¶21} Crim.R. 3 defines a criminal complaint as follows:

{¶22} "[A] written statement of the essential facts constituting the offense charged. It shall also state the numerical designation of the applicable statute or ordinance. It shall be made upon oath before any person authorized by law to administer oaths."

{¶23} A complaint is deemed sufficient if it charges an offense in the words of the statute or ordinance upon which it is based. *State v. Riffle,* Pickaway App. No. 00CA041, 2001-Ohio-2415 (citation omitted). In determining the sufficiency of a complaint, the Ohio Supreme Court stated that "[i]t is not necessary that the affidavit be executed by one who observed the commission of the offense. It is sufficient if such person has reasonable grounds to believe that the accused has committed the crime." *Sopko v. Maxwell* (1965), 3 Ohio St.2d 123, 124, 209 N.E.2d 201; *State v. Maxwell* (1995), 102 Ohio App.3d 1, 656 N.E.2d 954, *State v. Hawk,* 3rd Dist. No. 1-03-54, 2004-Ohio-922.

{¶24} The complaint/affidavit in the case at bar specifically set forth the essential facts constituting the charged offenses, and designated the applicable statutes for the offenses charged against appellant. The officer attested under oath to the affidavit, signed it in front of a notary, and the affidavit was properly notarized pursuant to Crim. R. 3. The officer who signed the affidavit received the information from the arresting officer. (2T. at 225). He transported appellant after he was arrested, and completed the necessary paperwork. (Id. at 220-223).

{¶25} Crim. R. 3 was complied with in the case at bar. Therefore the trial court had proper jurisdiction to proceed with appellant's case.

{¶26} Appellant's First Assignment of Error is overruled.

II.

{¶27} In his second assignment of error, Appellant contends the trial court erred in denying his speedy trial motion. We disagree.

{¶28} In Ohio, the right to a speedy trial has been implemented by statutes that impose a duty on the State to bring to trial a defendant who has not waived his right to a speedy trial within the time specified by the particular statute. R.C. 2945.71.

{¶29} Appellant argues that he was not brought to trial within the 45 day speedy trial guidelines for a fourth-degree misdemeanor as provided by Revised Code 2945.71.

{¶30} Our standard of review upon an appeal raising a speedy trial issue is to count the expired days as directed by R.C. § 2945.71, et seq. *State v. DePue* (1994), 96 Ohio App.3d 513, 516, 645 N.E.2d 745; See, also, *Cleveland v. Seventeenth Street Association* (Apr. 20, 2000), Cuyahoga App. No. 76106; *State v. Gabel* (Oct. 31, 1996), Cuyahoga App. No. 69607. Where we find ambiguity, we construe the record in favor of the accused. *State v. Singer* (1977), 50 Ohio St.2d 103, 109, 362 N.E.2d 1216; *State v. Mays* (1996), 108 Ohio App.3d 598, 609, 671 N.E.2d 553.

{¶31} The law in Ohio is that the right to a speedy trial time starts to run the day after arrest. R.C. 2945.71. However, we toll "any period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused." R.C. 2945.72(E).

{¶32} On February 4, 2004 the trial court journalized its decision overruling appellant's motion to dismiss for violation of his right to a speedy trial. The trial court noted that appellant was arrested on June 20, 2003 and charged with Persistent Disorderly Conduct in Pickerington Mayor's Court. Appellant was arranged on June 30, 2003 at which time appellant executed a waiver of time. Accordingly, only the time period between June 20 and June 30, 2003 applied for speedy trial purposes.

{¶33} Appellant's case was dismissed in the Mayor's court on August 15, 2003, and subsequently re-filed in the Lancaster Municipal Court on August 19, 2003. On September 5, 2003, appellant filed his first Motion to Dismiss. By Judgment Entry filed September 16, 2003, the trial court set the motion for hearing on November 11, 2003. On October 8, 2003, appellant filed his second Motion to Dismiss. The preceding facts are set forth in the trial court's February 4, 2004 Judgment Entry.

{¶34} In *State v. Bickerstaff* (1984), 10 Ohio St.3d 62, 461 N.E.2d 892 the Ohio Supreme Court noted with respect to R.C.2945.72(E): "[i]t is evident from a reading of the statute that a motion to dismiss acts to toll the time in which a defendant must be brought to trial." Id. at 67, 461 N.E. 2d 892. Accordingly, the time period between September 5, 2003 and the trial court's ruling on the Motions on November 10, 2003 is not included for speedy trial purposes. In *Bickerstaff*, supra, the Court found no prejudice from a five month delay between the filing of the Motion to Dismiss and the trial court's ruling upon the motion. Id.

{¶35} On November 11, 2003 appellant executed a time waiver. On December 18, 2003 appellant executed a second time waiver.

{¶36} Accordingly, ten (10) days elapsed between appellant's arrest, his arraignment in Mayor's Court and his signing a time waiver. Eighteen (18) days elapsed between the re-filing of the case in Municipal Court on August 19, 2003 and appellant's filing of his first Motion to Dismiss in the Municipal Court on September 5, 2003. Two (2) days elapsed between the trial court's oral ruling denying both of appellant's motions to dismiss on November 10, 2003 and the appellant's execution of a time waiver in the municipal court case on November 12, 2003. Accordingly, only thirty

(30) of the statutory forty-five (45) days had elapsed prior to appellant's execution of his first time waiver.

{¶37} The trial court correctly ruled that appellant's right to a speedy trial was not abridged. Accordingly, appellant's Second Assignment of Error is overruled.

III.

{¶38} In his Third Assignment of Error, appellant argues that the trial court erred by not permitting appellant to cross-examine and present evidence concerning a pending civil suit brought against the City of Pickerington and the officer who arrested appellant arising from the underlying facts which form the basis of the charges against appellant. Appellant further argues that it was error to permit the testimony of Tom Hart relating to the Building Industries Association's rules and regulations governing the Parade of Homes.

{¶39} The trial court treated appellant's request to cross-examine concerning the civil suit as a Motion in Limine. (1T. at 82). The granting or denial of a motion in limine is a tentative, interlocutory, precautionary ruling reflecting the trial court's anticipatory treatment of an evidentiary issue. *State v. Grubb* (1986), 28 Ohio St.3d 199, 201, 503 N.E.2d 142. Appellant fails to identify in the record where he attempted to seek introduction of Cmdr. Annetts' testimony at trial concerning a pending civil suit and never proffered what his testimony would have been into the record. Having failed to do so, appellant has failed to preserve this issue for appellate review and cannot demonstrate prejudice.

{¶40} Appellant's proffer of the testimony of Robert Mapes, prosecuting attorney for Pickerington Mayor's Court, reveals that it was *appellant* who offered not to file a civil

suit or to dismiss his civil suit if the State would dismiss the criminal charges. (1T. at 88). The trial court also noted that the criminal charges were filed before the institution of any civil suit. (1T. at 13).   The in-chamber discussions were not placed upon the record so appellant has failed to preserve this issue for appellate review.

The admission or exclusion of relevant evidence rests within the sound discretion of the trial court. *State v. Sage* (1987), 31 Ohio St.3d 173, paragraph two of the syllabus. Therefore, we will not disturb a trial court's evidentiary ruling unless we find the trial court abused its discretion. "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *State v. Adams* (1980), 62 Ohio St.2d 151, 157.

{¶41} Of course, a trial court can impose reasonable limits upon cross-examination: "[i]t does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness.  On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.  And as we observed earlier this Term, 'the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' *Delaware v. Fensterer* (1985), 474 U.S. 15, 20, 88 L.Ed.2d 15, 106 S.Ct. 292 (per curiam) (emphasis in original)." *Van Arsdall*, supra, 475 U.S. at 679.

{¶42} Any violation of appellant's Sixth Amendment rights was harmless beyond a reasonable doubt. In *Van Arsdall*, supra, the Court stated:"[t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. Cf. *Harrington,* 395 U.S., at 254, 23 L.Ed. 2d 284, 89 S.Ct. 1726; *Schneble v. Florida*, 405 U.S. at 432, 31 L.Ed. 2d 340, 92 S.Ct. 1056."

{¶43} In the instant matter, a civil suit against the City of Pickerington and Commander Annetts was instituted by appellant. In the case at bar the issue of the civil suit was only marginally relevant, if relevant at all. The proffered record clearly indicates that the police department was not interested in dropping the charges in exchange for a dismissal of the civil suit. (Id. at 88). Accordingly, it can hardly be argued that this action has been maintained in an effort to avoid liability on the part of the police or prosecutor.

{¶44} We cannot find that the trial court abused its discretion on the issue of the civil suit.

{¶45} In applying the factors set forth in *Van Arsdall,* supra, the trial court's refusal to permit cross-examination of the complaining witness on the pending civil suit

was harmless beyond a reasonable doubt.  Accordingly, appellant's right to confront his accuser pursuant to the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution were not violated.  This part of Appellant's Third Assignment of Error is overruled.

{¶46} With respect to the testimony concerning the enforcement of the rules and regulations of the Building Industry Association, we find the evidence was relevant to establish the rules and regulations for patrons and workers attending the Parade of Homes on the date in question.  The testimony established the rules and regulations in place for parking and admittance, and the authority and enforcement of special duty officers like Commander Annetts. The testimony further related to the distinctions between a worker pass, VIP pass and the signage that was observable in the area concerning the ability to park in various areas designated for parking.  The appellant's argument that the evidence was irrelevant because he did not have personal knowledge goes to the weight not the admissibility of the evidence.  Accordingly, the trial court did not err in permitting the testimony of Mr. Hart.  This part of appellant's Third Assignment of Error is overruled.

{¶47} Accordingly, appellant's Third Assignment of Error is overruled.

IV. & V.

{¶48} In his Fourth Assignment of error appellant argues that his conviction is not supported by sufficient evidence.  In his Fifth Assignment of Error appellant argues that his conviction is against the manifest weight of the evidence.  We shall address these assignments of error together.

{¶49} Our standard of reviewing a claim a verdict was not supported by sufficient evidence is to examine the evidence presented at trial to determine whether the evidence, if believed, would convince the average mind of the accused's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt, *State v. Jenks* (1991), 61 Ohio St. 3d 259.

{¶50} The Supreme Court has explained the distinction between claims of sufficiency of the evidence and manifest weight. Sufficiency of the evidence is a question for the trial court to determine whether the State has met its burden to produce evidence on each element of the crime charged, sufficient for the matter to be submitted to the jury.

{¶51} Manifest weight of the evidence claims concern the amount of evidence offered in support of one side of the case, and is a jury question. We must determine whether the jury, in interpreting the facts, so lost its way that its verdict results in a manifest miscarriage of justice, *State v. Thompkins* (1997), 78 Ohio St. 3d 387, citations deleted. On review for manifest weight, a reviewing court is "to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the

judgment." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175.

{¶52} Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, syllabus 1.

{¶53} In the case at bar, the trial court instructed the jury that to find the appellant guilty of criminal trespass, the State was required to prove beyond a reasonable doubt that appellant, "[w]ithout privilege to do so, being upon the land or premises of another, negligently did fail or refuse to leave upon being notified to do so by the owner or occupant or the agent or servant of either." (2T. at 421).

{¶54} The evidence established at trial in appellant's case that On June 20, 2003, Commander Stephen H. Annetts of the City of Pickerington Police Department was working special duty for the BIA (Building Industry Association of Central Ohio) at the Parade of Homes in Pickerington, Ohio. The property was contractually in the control of the BIA and private security and local law enforcement were hired by the BIA to control traffic and enforce the rules and regulations established by the BIA for the Parade of Homes.

{¶55} The testimony established the rules and regulations in place for parking and admittance, and the authority and enforcement of special duty officers like Commander Annetts. The testimony further related to the distinctions between a worker pass, VIP pass and the signage that was observable in the area concerning the ability to park in various areas designated for parking.

{¶56} Commander Annetts informed appellant on 2 or 3 occasions that he needed to move the vehicle or leave the Parade of Homes.

{¶57} Viewing this evidence in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that appellant had committed the crime of criminal trespass.

{¶58} We hold, therefore, that the state met its burden of production regarding each element of the crime of criminal trespass and, accordingly, there was sufficient evidence to support appellant's conviction.

{¶59} Although appellant presented his testimony and that of several witnesses and cross examined the officer regarding his actions to contradict the State's inference that he, without privilege to do so negligently failed or refused to leave after being told to do, the jury was free to accept or reject any and all of the evidence offered by the appellant and assess the witness's credibility. Although the evidence may have been circumstantial, we note that circumstantial evidence has the same probative value as direct evidence. *State v. Jenks* (1991), 61 Ohio St. 3d 259, 574 N.E. 2d 492.

{¶60} It is well established that trespass can be committed even upon public land. *Adderley v. Florida* (1966), 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149. See, also, the discussion in the dissent in *Athens v. Bromall* (1969), 20 Ohio App.2d 140,166, 252 N.E.2d 298.

{¶61} If the status of land as public property is not always a defense to a charge of trespass, which is always an entry without privilege, then, concomitantly, the public official or agency into whose charge the property is put can withdraw or revoke the privilege otherwise enjoyed by a member of the public to enter. Whether that action has

occurred, and whether it is reasonable, is a question of fact. See, e.g. *Dayton v. Moore* (March 25, 1993), 2nd Dist. No. 13369. Whether appellant's privilege was withdrawn in the case at bar was an issue for the trier of fact.

{¶62} We conclude the jury, in resolving the conflicts in the evidence, did not create a manifest miscarriage of justice so as to require a new trial. Viewing this evidence in a light most favorable to the prosecution, we further conclude that a rational trier of fact could have found beyond a reasonable doubt that appellant without privilege to do so negligently failed to leave upon being notified to do so. Accordingly, appellant's conviction for criminal trespass was not against the manifest weight of the evidence.

{¶63} Appellant's Fourth and Fifth Assignments of Error are overruled.

VI.

{¶64} In his Sixth Assignment of Error, appellant argues that he was denied due process and equal protection by the trial court's failure to order the State to provide a Bill of Particulars. We disagree.

{¶65} In the case at bar, only one count of criminal damaging was submitted to the jury at the conclusion of appellant's trial. Appellant's argument that he did not know what particular act constituted the trespass, i.e. failure to move the car, or failure to leave the area is unpersuasive.

{¶66} "The *Schad[ v. Arizona* (1991), 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555] court noted: 'We have never suggested that in returning general verdicts in [cases proposing multiple theories] the jurors should be required to agree upon a single means of commission, any more than the indictments were required to specify one alone. In

these cases, as in litigation generally, 'different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict.' 'Id. at 631-632, 111 S.Ct. 2491, 115 L.Ed.2d 555, quoting *McKoy v. N. Carolina* (1990), 494 U.S. 433, 449, 110 S.Ct. 1227, 108 L.Ed.2d 369 (Blackmun, J., concurring)." *State v. Skates* (2004), 104 Ohio St.3d 195, 205-206, 2004-Ohio-6391 at ¶53-54, 819 N.E.2d 215, 237.

{¶67} Appellant was not prejudiced because he was in fact able to present his defense and arguments to each theory upon which the charge of criminal trespass was premised. Further the trial court instructed the jury that the crime charge was based upon appellant's "[w]ithout privilege to do so, being upon the land or premises of another, negligently did fail or refuse to leave upon being notified to do so by the owner or occupant or the agent or servant of either." (2T. at 421).

{¶68} Accordingly, appellant's Sixth Assignment of Error is overruled.

VII.

{¶69} In his Seventh Assignment of Error, appellant maintains that he was denied equal protection and due process by the trial court's deadlock instruction to the jury without notifying counsel and further the failure of the trial court to instruct the jury that the State must prove lack of privilege to sustain a conviction for criminal trespass. We disagree.

{¶70} As a general rule, any communication with the jury outside the presence of the defendant or parties to a case by either the judge or court personnel is error which may warrant the ordering of a new trial. *Rushen v. Spain* (1983), 464 U.S. 114, 104

S.Ct. 453, 78 L.Ed.2d 267, *Remmer v. United States* (1954), 347 U.S. 227, 74 S.Ct.

450, 98 L.Ed. 654, *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 149, 524 N.E.2d 881,

886.

{¶71} Private communications outside the presence of the defendant, does not,

however, create a conclusive presumption of prejudice. *Remmer v. United States*,

supra, at 229; *State v. Jenkins* (1984), 15 Ohio St.3d 164, 236-237, 473 N.E.2d 264.

{¶72} {¶ 30} A defendant has a constitutional right to be present at a proceeding

"whenever his presence has a relation, reasonably substantial, to the fullness of his

opportunity to defend against the charge ... [T]he presence of a defendant is a condition

of due process to the extent that a fair and just hearing would be thwarted by his

absence, and to that extent only." *Snyder v. Massachusetts*, 291 U.S. 97, 105-106, 54

S.Ct. 330, 332, 78 L.Ed. 674 (1934). See, *State v. Wilhelm* (Oct. 14, 2004), 5th Dist. No.

03CA25. 03CA26, 2004-Ohio-5522 at ¶28-30.

{¶73} In a direct appeal, a reviewing court may only consider what is contained in

the trial court record. See, e.g., *State v. Ishmail* (1976), 54 Ohio St.2d 402, 377 N.E.2d

500, syllabus. See, also, *State v. Hartman*, 93 Ohio St.3d 274, 299, 2001-Ohio-1580,

754 N.E.2d 1150 (explaining that if establishing ineffective assistance of counsel

requires proof outside the record, then such claim is not appropriately considered on

direct appeal). The record in the case at bar contains no reference to the trial court

instructing the jury regarding deadlock.  To raise this claim, if appellant bases his

contention on matters outside the record, a defendant must pursue the post-conviction

remedies outlined in R.C. 2953.21. *State v. Jacobson*, Adams App. No. 01CA730,

2003-Ohio-1201, at ¶ 14, quoting *State v. Cooperrider* (1983), 4 Ohio St.3d 226, 228,

448 N.E.2d 452. Therefore, the appellant's claim in this regard is not properly before this Court.

{¶74} The giving of jury instructions is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *State v. Martens* (1993), 90 Ohio App.3d 338. In order to find an abuse of that discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217. Jury instructions must be reviewed as a whole. *State v. Coleman* (1988), 37 Ohio St.3d 286.

{¶75} The trial court charged the jury as to the specific elements of criminal trespass. The jury charge is explicit as to the statutory elements and the definition of privilege. (2T. at 418-428). The defense counsel addressed the issue of privilege in his closing arguments. Id. at 415). Upon review, we find no error in the trial court's instructions.

{¶76} Appellant's Seventh Assignment of Error is overruled.

VIII.

{¶77} In his Eighth Assignment of Error, Appellant maintains that the trial court abused its discretion in sentencing appellant to 2 years of probation and 120 hours of community service. We disagree.

{¶78} Misdemeanor sentencing is governed by R.C. 2929.22 which states as follows:

{¶79} "(A) In determining whether to impose imprisonment or a fine, or both, for a misdemeanor, and in determining the term of imprisonment and the amount and method

of payment of a fine, the court shall consider the risk that the offender will commit another offense and the need for protecting the public from the risk; the nature and circumstances of the offense; the history, character, and condition of the offender and his need for correctional or rehabilitative treatment; any statement made by the victim, if the offense is a misdemeanor specified in division (A) of section 2930.01 of the Revised Code; and the ability and resources of the offender and the nature of the burden that payment of a fine will impose on him.

{¶80} "(B) The following do not control the court's discretion, but shall be considered in favor of imposing imprisonment for a misdemeanor:

{¶81}  "(1) The offender is a repeat or dangerous offender;

{¶82}  "(2) Regardless of whether or not the offender knew the age of the victim, the victim of the offense was sixty-five years of age or older, permanently and totally disabled, or less than eighteen years of age at the time of the commission of the offense.

{¶83} "(C) The criteria listed in section 2929.12 of the Revised Code, favoring shorter terms of imprisonment for felony, do not control the court's discretion, but shall be considered against imposing imprisonment for a misdemeanor.

{¶84} "(D) The criteria listed in divisions (B) and (C) of this section shall not be construed to limit the matters which may be considered in determining whether to impose imprisonment for a misdemeanor.

{¶85} "(E) The court shall not impose a fine in addition to imprisonment for a misdemeanor, unless a fine is specially adapted to deterrence of the offense or the correction of the offender, the offense has proximately resulted in physical harm to the

person or property of another, or the offense was committed for hire or for purpose of gain.

{¶86} "(F) The court shall not impose a fine or fines which, in the aggregate and to the extent not suspended by the court, exceeds the amount which the offender is or will be able to pay by the method and within the time allowed without undue hardship to himself or his dependents, or will prevent him from making restitution or reparation to the victim of his offense."

{¶87} Sentencing and imposing fines are within the sound discretion of the trial court. *State v. O'Dell* (1989), 45 Ohio St.3d 140, 543 N.E.2d 1220. In order to find an abuse of that discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 450 N.E.2d 1140.

{¶88} R.C. 2951.02(B) states: "(B) If an offender is convicted of or pleads guilty to a misdemeanor, the court may require the offender, as a condition of the offender's sentence of a community control sanction, to perform supervised community service work in accordance with this division…"

{¶89} This section grants broad discretion to the trial court to consider and impose any conditions that may be said reasonably to relate to the stated statutory ends. *State v. Jones* (1990), 49 Ohio St.3d 51, 550 N.E.2d 469.   In the context of probation, with the test of reasonableness anchored to the language of R.C. 2951.02(C), the Ohio Supreme Court, in *Jones, supra,* at 53, 550 N.E.2d at 470, adopted the Sixth Appellate District's criteria from *State v. Livingston* (1976), 53 Ohio

App.2d 195, 372 N.E.2d 1335 to determine whether a condition of probation exceeded the scope of the statute:

{¶90} ""In determining whether a condition of probation is related to the 'interests of doing justice, rehabilitating the offender, and insuring his good behavior,' courts should consider whether the condition (1) is reasonably related to rehabilitating the offender (2) has some relationship to the crime of which the offender was convicted, and (3) relates to conduct which is criminal or reasonably related to future criminality and serves the statutory ends of probation."

{¶91} In the case at bar, the trial court did not sentence appellant to a term of imprisonment.  The court had the benefit of as pre-sentence investigation report.  In *State v. Untied* (Mar. 5, 1998), Muskingum App. No. CT97-0018, we addressed the issue of failure to include the pre-sentence investigation report and stated: "Appellate review contemplates that the entire record be presented.

{¶92} "App.R. 9. When portions of the transcript necessary to resolve issues are not part of the record, we must presume regularity in the trial court proceedings and affirm. *Knapp v. Edwards Laboratories* (1980), 61 Ohio St.2d 197, 400 N.E.2d 384. The pre-sentence investigation report could have been submitted "under seal" for our review.

{¶93} "Without the cited information and given the trial court (sic) findings on the record, we cannot say appellant's sentence was against the manifest weight of the evidence or 'contrary to law." Id. at 7.

{¶94} We reach the same conclusion, in the case sub judice, because appellant failed to include in the record the pre-sentence investigation report.

{¶95}  We conclude that the trial court did not commit error when it sentenced Appellant to a term of community service and probation in lieu of actual incarceration.

{¶96}  Appellant's Eight Assignment of Error is overruled.

IX.

{¶97}  In his Ninth Assignment of Error appellant maintains that the State is guilty of selective prosecution.

{¶98}  We find that this issue was not presented in the trial court. "The general rule is that 'an appellate court will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court.' *State v. Childs* (1968), 14 Ohio St.2d 56, 236 N.E.2d 545, paragraph three of the syllabus; *State v. Glaros* (1960), 170 Ohio St. 471 166 N.E.2d 379, paragraph one of the syllabus; *State v. Lancaster* (1971), 25 Ohio St.2d 83, 267 N.E.2d 291, paragraph one of the syllabus; *State v. Williams* (1977), 51 Ohio St.2d 112, 117, 364 N.E.2d 1364.  Likewise, '[c]onstitutional rights may be lost as finally as any others by a failure to assert them at the proper time.' *State v. Childs,* supra, 14 Ohio St.2d at 62, 236 N.E.2d 545, citing *State v. Davis* (1964), 1 Ohio St.2d 28, 203 N.E.2d 357;  *State, ex rel. Specht, v. Bd. of Edn.* (1981), 66 Ohio St.2d 178, 182, 420 N.E.2d 1004, citing *Clarington v. Althar* (1930), 122 Ohio St. 608, 174 N.E. 251, and *Toledo v. Gfell* (1958), 107 Ohio App. 93, 95, 156 N.E.2d 752.  [Footnote omitted.].

{¶99}  Accordingly, appellant's Ninth Assignment of Error is overruled.

{¶100} For the foregoing reasons, the judgment of the Lancaster Municipal Court is affirmed.

By Gwin, P.J.,

Hoffman, J., and

Wise, J., concur

_____

_____

_____

JUDGES

WSG:clw 0224


IN THE COURT OF APPEALS FOR FAIRFIELD COUNTY, OHIO

FIFTH APPELLATE DISTRICT

STATE OF OHIO                         :
                                      :
            Plaintiff-Appellee        :
                                      :
                                      :
-vs-                                  :        JUDGMENT ENTRY
                                      :
KERRY M. DONAHUE                      :
                                      :
                                      :
        Defendant-Appellant           :        CASE NO. 2004-CA-20

For the reasons stated in our accompanying Memorandum-Opinion, the foregoing

reasons, the judgment of the Lancaster Municipal Court is affirmed.  Costs to appellant.

_____

_____

_____

JUDGES



**ROTHWELL, FIGG, ERNST & MANBECK, P.C.**

1425 K Street, N.W.
Suite 800
Washington, D.C. 20005

Telephone 202-783-6040
Facsimile 202-783-6031
www.rfem.com

G. Franklin Rothwell
E. Anthony Figg
Barbara G. Ernst
Harry F. Manbeck, Jr.
George R. Repper
Steven Lieberman
Joseph A. Hynds
Richard Wydeven
Martin M. Zoltick
Minaksi Bhatt
Sharon L. Davis
Robert B. Murray
Jeffrey L. Ihnen
Glenn E. Karta
Martha Cassidy, Ph.D.
Brian S. Rosenbloom
Jason M. Shapiro

*Not Admitted in D.C.

Anne M. Sterba
Lisa N. Phillips
C. Nichole Gifford
Patrick T. Skacel
Monica C. Kitts
Brian A. Tollefson
Joo Mee Kim
R. Elizabeth Brenner-Leifer
Adam M. Treiber
Daniel L. Shores
Joseph E. Green
John A. Evans, Ph.D.
Thomas D. Lyford
Oliver L. Edwards*
David B. Orange

Of Counsel
John A. McCahill
Brian E. Banner

August 6, 2007

*By E-mail*

Kerry Donahue, Esq.
Bellinger & Donahue
6295 Emerald Parkway
Dublin, Ohio 43016

   Re: <u>CareToLive v. von Eschenbach, et al.</u>

Dear Mr. Donahue:

   I received your voicemail from a few minutes ago. I suggest that you re-read my letter of earlier today. Mr. Goldberg has not been properly served – which you acknowledge. He is out of town on a long-planned vacation. Even if you were to serve him prior to next Monday, Mr. Goldberg will be asserting appropriate objections pursuant to Rule 45. If you or your representative appears at Mr. Goldberg's address next Monday you will not be admitted.

   If you wish to file a motion with the Court here in the District of Columbia you are, of course, free to do so. I am, however, putting you on notice that we will seek attorneys' fees in connection with your repeated failure to comply with the requirements of Rule 45 – including your obligation to minimize the expense and inconvenience imposed upon third parties. With respect to your assertions that you are entitled to the information you seek from a journalist regarding his sources, I would be interested to know what efforts, if any, you have made to obtain the information you seek from the parties to your litigation.

     Very truly yours,

     Steven Lieberman /RLD

     Steven Lieberman

SL:dob
cc: Mr. Paul Goldberg

**Debora O. Braxton**

**From:**    Steven Lieberman
**Sent:**    Monday, August 06, 2007 12:07 PM
**To:**    'paul@cancerletter.com'; Sharon Davis
**Cc:**    Debora O. Braxton
**Subject:**    Fw: CaretoLive


```
Steven Lieberman
Rothwell, Figg, Ernst & Manbeck. P.C.
1425 K Street, N.W.; Suite 800
Washington, DC 20005
Phone: 202-783-6040; Fax: 202-783-6031
e-mail: slieberman@rothwellfigg.com

web: http://www.rothwellfigg.com
```

The content of this e-mail may be privileged and confidential and is intended only for the
identified individual or entity. If you are not the intended recipient or are not
responsible for passing this e-mail to the intended recipient, then you are hereby
notified that any use, copying, dissemination or distribution of this e-mail is strictly
prohibited. If you have received this e-mail in error, please notify Rothwell, Figg, Ernst
& Manbeck, P.C. immediately by telephone at (202) 783-6040, by fax at (202)783-6031, or by
e-mail at slieberman@rothwellfigg.com. You should not read this e-mail, and it should be
deleted.


```
----- Original Message -----
From: BeDonWahoo@aol.com <BeDonWahoo@aol.com>
To: Steven Lieberman
Sent: Mon Aug 06 11:56:44 2007
Subject: Re: CaretoLive
```

In a message dated 8/6/2007 11:44:29 A.M. Eastern Daylight Time, slieberman@rfem.com
writes:



Debora Braxton, Assistant to

Steven Lieberman, Esquire

Rothwell, Figg, Ernst & Manbeck, P.C.

1425 K Street, N.W. | Suite 800 | Washington, DC 20005

Voice: 202-772-5667 |  Fax: 202-783-6031

www.rfem.com



Minimize expensive and inconvenience???

I offered to come there where he could hand me the evidence on his front porch.  How much
simpler could I make it.

I have been working with Paul to get the evidence for a week and he only today claims he
is on vacation. Your client accepted documents from federal employees and published them

1

in conspiracy with those employees to advance his own agenda and served to deny Plaintiffs their rights.  What he did was unlawful.  There is no right top protect a source here (we will seek fees for any frivolous assertion thereof).  What he is going to do is to force us to make him a party to this litigation if he wants to continue to deny us the evidence.

He has chosen not top cooperate and to make it as expensive and difficult as possible to obtain some simple information.

I am surprised you have take the position you have.  Cooperation would be much less expensive for everyone.  The alternative is I can depose him and subpoena him to all the hearings.  Like I said there is two ways to do this 1) the easy way, 2) the hard way, WHICH YOU AND YOUR CLIENT HAVE CHOSEN.

Please advise your client that destruction of evidence is a federal offense.


Kerry M. Donahue
BELLINGER AND DONAHUE, ATTORNEYS AT LAW
6295 Emerald Parkway
Dublin, Ohio 43016
(614) 761-0402

--------------------------------------------

Get a sneak peek of the all-new AOL.com <http://discover.aol.com/memed/aolcom30tour/?ncid=AOLAOF00020000000982> .

## Steven Lieberman

| | |
|---|---|
| **From:** | BeDonWahoo@aol.com |
| **Sent:** | Friday, August 10, 2007 11:26 PM |
| **To:** | Steven Lieberman |
| **Subject:** | Re: CareToLive |

Mr. Lieberman    Re: Caretolive v. FDA

Your attachment was corrupted and could not be opened please fax to me.  See you Monday at the Goldbergs.

Also since your clients have been so non cooperative please tell them that I have decided I need to take both their depositions as well as Boris deposition. We can do these at your office. Please provide some available dates and times for those depostions.  When the depositions are completed we shall decide whether to amend out complaint to add them as Defendants.  Please be advised that our deposition intends to inquire into matters as far back as Imclone leaks from the FDA.

Once you fax me the motion that could not be downloaded I shall decide whether to file rule 11 violations and seek fees for frivilous conduct against you and your client.

Kerry M. Donahue

In a message dated 8/10/2007 11:47:00 A.M. Eastern Daylight Time, slieberman@rfem.com writes:

> Debora Braxton, Assistant to
> Steven Lieberman, Esquire
> Rothwell, Figg, Ernst & Manbeck, P.C.
> 1425 K Street, N.W. | Suite 800 | Washington, DC 20005
> Voice: 202-772-5667 | Fax: 202-783-6031
> www.rfem.com
>
> <<Kerry Donahue Letter and Rule 45 Objections.pdf>>

Get a sneak peek of the all-new AOL.com.

8/13/2007

**Sharon Davis**

-----Original Message-----
**From:** BeDonWahoo@aol.com [mailto:BeDonWahoo@aol.com]
**Sent:** Friday, August 10, 2007 9:17 AM
**To:** Steven Lieberman
**Subject:** Re: CaretoLive

Mr. Lieberman          August 10, 2007

Please be advised that the clerk in Washington has had our petition to enforce subpoena since Wednesday morning but it has not been assigned a case number. It is filed just not posted on ECF. I expect the case number and ECF positing to be assigned within the next hour or two.

Your clients have been duly served and I still plan to be at their residence on Monday morning to enforce the subpoena. The first two subpoenas were not complied with by your client and no protection order was obtained by you. Therefore I consider your clients to be in contempt of court. Since two of the subpeona requested document at our office here in Dublin, Ohio (prior to today) I understand the civil rules to say that they will need to come here to show cause.

I am currently working on a motion for an order that your clients appear and show cause in the Southern District of Ohio why they did not comply with the first two subpoenas to produce documents to our office here in Dublin. I guess its only fait that if I am going to Washington that you get to come here also.

If you are still refusing to accept service for your clients then I will again serve them with the order to show cause.

Thank you for your complete lack of cooperation in this matter.

Kerry M. Donahue

Kerry M. Donahue
BELLINGER AND DONAHUE, ATTORNEYS AT LAW
6295 Emerald Parkway
Dublin, Ohio 43016
(614) 761-0402

8/17/2007

 ROTHWELL, FIGG, ERNST & MANBECK, P.C.

1425 K Street, N.W.
Suite 800
Washington, D.C. 20005

Telephone 202-783-6040
Facsimile 202-783-6031
www.rfem.com

G. Franklin Rothwell
E. Anthony Figg
Barbara G. Ernst
Harry F. Manbeck, Jr.
George R. Repper
Steven Lieberman
Joseph A. Hynds
Richard Wydeven
Martin M. Zoltick
Minaksi Bhatt
Sharon L. Davis
Robert B. Murray
Jeffrey L. Ihnen
Glenn E. Karta
Martha Cassidy, Ph.D.
Brian S. Rosenbloom
Jason M. Shapiro

*Not Admitted in D.C.

Anne M. Sterba
Lisa N. Phillips
C. Nichole Gifford
Patrick T. Skacel
Monica C. Kitts
Brian A. Tollefson
Joo Mee Kim
R. Elizabeth Brenner-Leifer
Adam M. Treiber
Daniel L. Shores
Joseph E. Green
John A. Evans, Ph.D.
Thomas D. Lyford
Oliver L. Edwards*
David B. Orange

Of Counsel
John A. McCahill
Brian E. Banner

August 10, 2007

*By Facsimile and E-mail*

Kerry Donahue, Esq.
Bellinger & Donahue
6295 Emerald Parkway
Dublin, Ohio 43016

Re:     CareToLive v. von Eschenbach, et al.

Dear Mr. Donahue:

I attach Rule 45 objections to various subpoenae you have purported to serve in the above-referenced matter. None of the subpoenae have been served on Paul Goldberg, Kirsten Goldberg or The Cancer Letter – although I understand that your process server did manage to serve one of Mr. Goldberg's neighbors (who sometimes parks in the Goldberg's driveway when they are away).

With respect to your e-mail of earlier today, if you travel to Washington, D.C. on Monday morning "to enforce the subpoena" as your e-mail indicates, you will be wasting your time. You will not be admitted to the Goldbergs' residence and no documents will be produced. The Goldbergs are, as I have told you in writing, away on a long-planned family vacation. Service has not been affected on them.

Your filings in the District Court for the District of Columbia are frivolous and your recently issued subpoenae purporting to require production in Ohio by a non-party located in D.C. are not in compliance with the Federal Rules for multiple reasons. If the Clerk in the United States District Court for the District of Columbia even accepts your filing and we are required to prepare a response, we will seek attorneys' fees on behalf of the Goldbergs and The Cancer Letter in connection with any filing you have made.

Frankly Mr. Donohue, I do not know where you learned to practice law, but I strongly suggest you familiarize yourself with the Federal Rules of Civil Procedure.

With respect to your threat to "enforce your subpoena" on Monday, I am aware of your conviction for criminal trespass in the state of Ohio. Given that history, we will

1422449_1

ROTHWELL, FIGG, ERNST & MANBECK, P.C.

Kerry Donahue, Esq.
Bellinger & Donahue
August 10, 2007
Page 2

promptly contact the D.C. police should you set foot on the Goldberg's property without appropriate legal authority.

Your internet postings suggest that this series of subpoenae is nothing more than a publicity stunt. It is, however, a publicity stunt with consequences for you and your client.

One final point. I noticed that your have purported to issue subpoenae from the United States District Court for the Southern District of Ohio and that you have threatened to make the Goldbergs come to Ohio to oppose some sort of application you intend to file – presumably to increase the burden and expense on the Goldbergs. You may wish to consider the effect of Fed. R. Civ. P. 45(c)(1) before filing a motion in the Southern District of Ohio. In addition, I would be most interested to know on what basis you believe the Federal Court in Ohio has personal jurisdiction over the Goldbergs -- who are residents of the District of Columbia – in a lawsuit in Ohio to which they are not parties.

Very truly yours,

Steven Lieberman

SL:dob
cc:    Sharon Davis, Esq.

1422449_1

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| **CARETOLIVE, a not for profit corporation,** | ) ) ) | |
| **Plaintiff,** | ) ) | **Case Number 2:07-CV-729** |
| **v.** | ) ) ) | |
| **ANDREW VON ESCHENBACH, Commissioner of the FDA, <u>et al.</u>,** | ) ) ) | |
| **Defendants.** | ) | |

## KIRSTEN GOLDBERG'S RESPONSES TO
## <u>CARETOLIVE'S RULE 45 SUBPOENA</u>

Kirsten Goldberg hereby responds to the subpoena for production of documents propounded by CareToLive.

### <u>OBJECTIONS</u>

1.     The subpoena has not been properly served in compliance with the provisions of Fed. R. Civ. P. 45.

2.     The subpoena has not been properly issued in compliance with the provisions of Fed. R. Civ. P. 45.

3.     The purported service of the subpoena violated Fed. R. Civ. P. 45(b)(2).

4.     The subpoena does not provide adequate notice prior to the purported time for production of materials.

5.     The subpoena was improperly issued in violation of Fed. R. Civ. P. 26(d) which bans Plaintiff from serving any discovery in the underlying action prior to the time the parties in the underlying action have held their Rule 26(f) conference – which has not occurred.

6.    The information sought is protected from disclosure by a variety of privileges including the D.C. Shield Law, federal common law and the First Amendment.  Plaintiff cannot demonstrate that it is entitled to receive any of the materials sought in light of these privileges.

7.    The subpoena to a non-party journalist is inappropriate given that the underlying lawsuit lacks all legal merit in light of the August 7, 2007 decision in the United States Court of Appeals for the District of Columbia Circuit in <u>Abigail Alliance for Better Access to Developmental Drugs and Washington Legal Foundation v. von Eschenbach</u>, No. 04-5350.

8.    Plaintiff should be barred from enforcing the subpoena through its misconduct and that of its attorney in harassing a non-party and their relatives including her minor daughter.

9.    The Goldbergs object to producing any documents protected from discovery by reason of the attorney-client privilege, attorney work product doctrine or other applicable privileges or immunities, or any documents containing the mental impressions, conclusions, opinions, or legal theories of any attorney or representative of the Goldbergs relating to this action.  To the extent Plaintiff's requests can be construed to include such privileged or exempt materials, the Goldbergs object to the request and will produce only non-privileged, non-exempt materials.

10.    The Goldbergs object to the breadth of CareToLive's requests to the extent that they seek information beyond the scope of the issues raised in this proceeding and are not reasonably calculated to lead to the discovery of admissible evidence.

11.    The Goldbergs object to the requests to the extent that they are burdensome, harassing, oppressive and overbroad.

Date: August 10, 2007                    Respectfully submitted,

_____

Steven Lieberman
Sharon L. Davis
ROTHWELL, FIGG, ERNST & MANBECK, P.C.
1425 K Street, N.W.
Suite 800
Washington, D.C.  20005
Tel: (202) 783-6040
Fax: (202) 783-6031

*Counsel for Kirsten Goldberg*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| CARETOLIVE, a not for profit corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case Number 2:07-CV-729 |
| v. | ) ) | |
| ANDREW VON ESCHENBACH, Commissioner of the FDA, <u>et al.</u>, | ) ) ) | |
| Defendants. | ) ) | |

### PAUL GOLDBERG, DBA CANCER LETTER'S RESPONSES
### TO CARETOLIVE'S RULE 45 SUBPOENA

Paul Goldberg, DBA Cancer Letter ("Cancer Letter") hereby responds to the subpoena

for production of documents propounded by CareToLive.

### <u>OBJECTIONS</u>

1.     The subpoena has not been properly served in compliance with the provisions of

Fed. R. Civ. P. 45.

2.     The subpoena has not been properly issued in compliance with the provisions of

Fed. R. Civ. P. 45.

3.     The purported service of the subpoena violated Fed. R. Civ. P. 45(b)(2).

4.     The subpoena does not provide adequate notice prior to the purported time for

production of materials.

5.     The subpoena was improperly issued in violation of Fed. R. Civ. P. 26(d) which

bans Plaintiff from serving any discovery in the underlying action prior to the time the parties in

the underlying action have held their Rule 26(f) conference – which has not occurred.

6.     The information sought is protected from disclosure by a variety of privileges including the D.C. Shield Law, federal common law and the First Amendment. Plaintiff cannot demonstrate that it is entitled to receive any of the materials sought in light of these privileges.

7.     The subpoena to a non-party journalist is inappropriate given that the underlying lawsuit lacks all legal merit in light of the August 7, 2007 decision in the United States Court of Appeals for the District of Columbia Circuit in <u>Abigail Alliance for Better Access to Developmental Drugs and Washington Legal Foundation v. von Eschenbach</u>, No. 04-5350.

8.     Plaintiff should be barred from enforcing the subpoena through its misconduct and that of its attorney in harassing a non-party and their relatives including Mr. Goldberg's minor daughter.

9.     Cancer Letter objects to producing any documents protected from discovery by reason of the attorney-client privilege, attorney work product doctrine or other applicable privileges or immunities, or any documents containing the mental impressions, conclusions, opinions, or legal theories of any attorney or representative of Cancer Letter relating to this action. To the extent Plaintiff's requests can be construed to include such privileged or exempt materials, Cancer Letter objects to the request and will produce only non-privileged, non-exempt materials.

10.     Cancer Letter objects to the breadth of CareToLive's requests to the extent that they seek information beyond the scope of the issues raised in this proceeding and are not reasonably calculated to lead to the discovery of admissible evidence.

11.     Cancer Letter objects to the requests to the extent that they are burdensome, harassing, oppressive and overbroad.

Date: August 10, 2007

Respectfully submitted,

Steven Lieberman
Sharon L. Davis
ROTHWELL, FIGG, ERNST & MANBECK, P.C.
1425 K Street, N.W.
Suite 800
Washington, D.C.  20005
Tel: (202) 783-6040
Fax: (202) 783-6031

*Counsel for Paul Goldberg, DBA Cancer Letter*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| CARETOLIVE, a not for profit corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case Number 2:07-CV-729 |
| v. | ) ) ) | |
| ANDREW VON ESCHENBACH, Commissioner of the FDA, <u>et al.</u>, | ) ) ) | |
| Defendants. | ) ) ) | |

## PAUL GOLDBERG AND KIRSTEN GOLDBERG'S
## RESPONSES TO CARETOLIVE'S RULE 45 SUBPOENA

Paul Goldberg and Kirsten Goldberg hereby respond to the subpoena for inspection of premises propounded by CareToLive.

### OBJECTIONS

1.     The subpoena has not been properly served in compliance with the provisions of Fed. R. Civ. 45.

2.     The subpoena has not been properly issued in compliance with the provisions of Fed. R. Civ. P. 45.

3.     The purported service of the subpoena violated Fed. R. Civ. P. 45(b)(2).

4.     The subpoena does not provide adequate notice prior to the purported time for production of materials.

5.     The subpoena was improperly issued in violation of Fed. R. Civ. P. 26(d) which bans Plaintiff from serving any discovery in the underlying action prior to the time the parties in the underlying action have held their Rule 26(f) conference – which has not occurred.

6.     The information sought is protected from disclosure by a variety of privileges including the D.C. Shield Law, federal common law and the First Amendment.  Plaintiff cannot demonstrate that it is entitled to receive any of the materials sought in light of these privileges.

7.     The subpoena to a non-party journalist is inappropriate given that the underlying lawsuit lacks all legal merit in light of the August 7, 2007 decision in the United States Court of Appeals for the District of Columbia Circuit in Abigail Alliance for Better Access to Developmental Drugs and Washington Legal Foundation v. von Eschenbach, No. 04-5350.

8.     Plaintiff should be barred from enforcing the subpoena through its misconduct and that of its attorney in harassing a non-party and their relatives including their minor daughter.

9.     The Goldbergs object to producing any documents protected from discovery by reason of the attorney-client privilege, attorney work product doctrine or other applicable privileges or immunities, or any documents containing the mental impressions, conclusions, opinions, or legal theories of any attorney or representative of the Goldbergs relating to this action.  To the extent Plaintiff's requests can be construed to include such privileged or exempt materials, the Goldbergs object to the request and will produce only non-privileged, non-exempt materials.

10.     The Goldbergs object to the breadth of CareToLive's requests to the extent that they seek information beyond the scope of the issues raised in this proceeding and are not reasonably calculated to lead to the discovery of admissible evidence.

11.     The Goldbergs object to the requests to the extent that they are burdensome, harassing, oppressive and overbroad.  In particular, the request to inspect all files and computers

used in the publication of the Cancer Letter is unreasonably burdensome and intended to harass the Goldbergs.

Date: August 10, 2007                    Respectfully submitted,

                                         _____
                                         Steven Lieberman
                                         Sharon L. Davis
                                         ROTHWELL, FIGG, ERNST & MANBECK, P.C.
                                         1425 K Street, N.W.
                                         Suite 800
                                         Washington, D.C.  20005
                                         Tel: (202) 783-6040
                                         Fax: (202) 783-6031

                                         *Counsel for Paul Goldberg and Kirsten Goldberg*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| CARETOLIVE, a not for profit corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case Number 2:07-CV-729 |
| v. | ) ) | |
| ANDREW VON ESCHENBACH, Commissioner of the FDA, <u>et al.</u>, | ) ) ) | |
| Defendants. | ) ) | |

## PAUL GOLDBERG, DBA CANCER LETTER'S
## RESPONSES TO CARETOLIVE'S RULE 45 SUBPOENA

Paul Goldberg, DBA Cancer Letter ("Cancer Letter") hereby responds to the subpoena for inspection of premises propounded by CareToLive.

## OBJECTIONS

1.     The subpoena has not been properly served in compliance with the provisions of Fed. R. Civ. 45.

2.     The subpoena has not been properly issued in compliance with the provisions of Fed. R. Civ. P. 45.

3.     The purported service of the subpoena violated Fed. R. Civ. P. 45(b)(2).

4.     The subpoena does not provide adequate notice prior to the purported time for production of materials.

5.     The subpoena was improperly issued in violation of Fed. R. Civ. P. 26(d) which bans Plaintiff from serving any discovery in the underlying action prior to the time the parties in the underlying action have held their Rule 26(f) conference – which has not occurred.

6.    The information sought is protected from disclosure by a variety of privileges including the D.C. Shield Law, federal common law and the First Amendment.  Plaintiff cannot demonstrate that it is entitled to receive any of the materials sought in light of these privileges.

7.    The subpoena to a non-party journalist is inappropriate given that the underlying lawsuit lacks all legal merit in light of the August 7, 2007 decision in the United States Court of Appeals for the District of Columbia Circuit in <u>Abigail Alliance for Better Access to Developmental Drugs and Washington Legal Foundation v. von Eschenbach</u>, No. 04-5350.

8.    Plaintiff should be barred from enforcing the subpoena through its misconduct and that of its attorney in harassing a non-party and their relatives including Mr. Goldberg's minor daughter.

9.    Cancer Letter objects to producing any documents protected from discovery by reason of the attorney-client privilege, attorney work product doctrine or other applicable privileges or immunities, or any documents containing the mental impressions, conclusions, opinions, or legal theories of any attorney or representative of Cancer Letter relating to this action.  To the extent Plaintiff's requests can be construed to include such privileged or exempt materials, Cancer Letter object to the request and will produce only non-privileged, non-exempt materials.

10.    Cancer Letter objects to the breadth of CareToLive's requests to the extent that they seek information beyond the scope of the issues raised in this proceeding and are not reasonably calculated to lead to the discovery of admissible evidence.

11.    Cancer Letter objects to the requests to the extent that they are burdensome, harassing, oppressive and overbroad.  In particular, the request to inspect all files and computers used in the publication of the Cancer Letter is unreasonably burdensome and intended to harass.

Date: August 10, 2007                    Respectfully submitted,

                                         _____
                                         Steven Lieberman
                                         Sharon L. Davis
                                         ROTHWELL, FIGG, ERNST & MANBECK, P.C.
                                         1425 K Street, N.W.
                                         Suite 800
                                         Washington, D.C.  20005
                                         Tel: (202) 783-6040
                                         Fax: (202) 783-6031

                                         *Counsel for Paul Goldberg, DBA Cancer Letter*

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

CareToLive, a not for profit corporation
C/O Statutory Agent
6295 Emerald Parkway
Dublin, Ohio 43016

        Plaintiff,

vs.

Andrew von Eschenbach, in his
official capacity as Commissioner
Food and Drug Administration,
      14-71 Parklawn Building
      5600 Rockville, MD 20857

        Defendant,

and

Mike Leavitt, in his capacity as
Secretary of the U.S. Department of
Health and Human Services,
      200 Independence Avenue SW
      Washington, DC  20201

        Defendant,

and

Richard Pazdur, in his capacity as an employee
of the FDA and in his own individual capacity
      14-71 Parklawn Building
      5600 Rockville, MD 20857

        Defendant,

and

Howard Scher, in both his individual capacity and
as a special government employee, FDA.
      1275 York Avenue
      New York, NY 10021

        Defendant.

Case No. 2:07 729

Judge Frost

Magistrate King

1

# COMPLAINT

Now comes CareToLive, a not for profit corporation, formed under the laws of the State of Ohio, an association of prostate cancer patients, cancer patients, patient families, doctors, investors and advocates, and on behalf of themselves and its membership, doctors on behalf of their patients, and all other androgen independent prostate cancer patients (hereinafter "Plaintiffs"), and hereby aver the following claims and causes of action against the Defendants, Andrew von Eschenbach, in his official capacity as Commissioner Food and Drug Administration, Mike Leavitt, in his capacity as Secretary of the U.S. Department of Health and Human Services, Richard Pazdur, in his capacity as an employee of the FDA and in his own individual capacity, Howard Scher, in both his individual capacity and as a special government employee, FDA (hereinafter collectively referred to as "Defendants").

# JURISDICTION AND VENUE

1. The court has jurisdiction over this action under 28 U.S.C. 1331, in that the action arises under the laws of the United States, including but not limited to 21 U.S.C. § 355(d), 28 U.S.C. § 2201(a) (Declaratory Judgment Act) as well as under the Administrative Procedures Act (APA), 5 U.S.C. 702 & 704 and under the United States and State Common Law of Torts, and under the United States Constitution for the violation of the patients constitutionally protected right to due process that arises due to the Defendants complete denial and refusal to follow FDA regulations and protocol when the Defendants arbitrarily and capriciously decided to deny approval of Sipuleucel-T (hereinafter referred to under its marketing name of "Provenge") on May 9, 2007, which action has deprived Provenge to the patients who need it now.

2. Venue is appropriate as CareToLive is an Ohio not for profit corporation, its statutory agent is in Ohio, many Plaintiff members are in Ohio, prostate cancer patients are living and dying in Ohio and patients families and doctors in Ohio want this treatment for their family, friends and patients. Every man in this country has a one in six chance to get prostate cancer, Plaintiffs include them all.. Defendants are the government (FDA) and government employees, as well as individuals who reside in various States and there is no real property involved.

## **THE PARTIES**

3. The Plaintiffs are cancer patients individually, doctors seeking help for their patients , families seeking help for their loved ones, current, past and future prostate cancer patients, potential prostate cancer patients and a not for profit corporation, CareToLive, who's members are made up of representatives of each of the classes of individuals set forth above, and who seek to advance the right to life of prostate cancer patients, who could have or would have benefited from Provenge, both past, present, and future who have an absolute right to fight for their lives and choose to live and enjoy a continued quality of life that access to an undeniably safe immunotherapy, Provenge, (which has done all that is required of it to obtain government approval, but which cannot get fair and due process) may provide, and who otherwise seek to immediately enjoin the Defendants from denying, for even one more day, the marketing and distribution of Provenge, to them.

4. Andrew von Eschenbach is the commissioner of the Food and Drug Administration (hereinafter "FDA") and this action is brought against him in his official capacity.

5.  Mike Leavitt, in his official capacity as Secretary of the U.S. Department of Health and Human Services, which agency violated the oversight duties it has with regards to the FDA and did allow a complete breakdown of procedural due process within the FDA, and did allow FDA employees to abuse their authorities by taking various actions within the FDA including a complete lack of supervision which has allowed Defendant Richard Pazdur to lead a political coup d'etat within the FDA; has failed to investigate leaks from within the FDA to hedge funds, stockbrokers and others, failed to investigate the improper use of federal employees for non-agency business matters and did allow federal employees to facilitate their own personal agendas within the FDA, and in doing so did deplete government resources.

6.  Dr. Richard Pazdur, is the head of the FDA's Office of Oncologic Drug Division (OOD) who both as an employee of the FDA and while exceeding the scope of his employment, did intentionally violate Federal Regulations and US law by improperly controlling the make up of FDA advisory committees, applying improper pressure on advisory committee members and other FDA employees and did participate in purposely denying due process to the BLA for Provenge, filed by Dendreon Corporation (a third party who is attempting to provide aid to dying patients), in an effort to achieve a pre determined outcome and did knowingly deny patients due process by the actively ensuring an arbitrary and capricious decision to deny approval of Provenge, to the detriment of patients.

7.  Dr. Howard Scher is a special government employee of the FDA and acting in his capacity as an employee and advisor did make false representations regarding Provenge, both before and after the FDA advisory meeting in an effort to mislead the

4

FDA, doctors, patients and investors, and further did fail to disclose all conflicts of interest that would have placed the FDA on notice that his own personal interests provided him additional reasons to cause a desired decision that the Provenge BLA not be immediately approved for marketing and use by dying patients and further did exceed the scope of his employment (acting in his individual capacity), when he did unlawfully use his position in violation of federal law and regulations and did undertake to act while failing to disclose all conflicts of interest, did then make knowing misrepresentations to the press in a further post meeting effort to derail the imminent approval of Provenge, in a manner that has callously deprived cancer patients of a safe and effective immunotherapy.

## **THE FACTS**

### **DEFENDANT FDA HISTORY**

8.  In contrast to ancient principles that dying men may try to save themselves from dying, regulation of access to new drugs has a history in this country that is of recent origin. Prior to 1906, there was essentially no drug regulation in the United States. In that year Congress enacted the Pure Food and Drug Act ("1906 Act"), Pub.L. No. 59-384, 34 Stat. 768 (repealed 1938), which prohibited misbranded and adulterated foods or drugs from entering interstate commerce, and prohibited false and misleading labeling. For a small number of particularly dangerous drugs, the 1906 Act required the labels to identify the drug's ingredients and quantities. The statute also authorized the Bureau of Chemistry, a predecessor of the FDA, to seize nonconforming goods and to recommend federal prosecution of those who violated the 1906 Act. The 1906

Act did not, however, limit individual access to new drugs or regulate therapeutic claims by drug manufacturers.

9. A patient still could obtain access to any new drug for medicinal use, even if the drug had no therapeutic benefit, albeit subject to the controls placed on narcotics in 1914 by the Harrison Narcotic Act.

10. The 1938 Act did not, however, require drug manufacturers to receive affirmative FDA approval before marketing the drug. Rather, an NDA became automatically effective within a time frame set by the FDA unless the FDA determined that the drug was unsafe and barred its commercial distribution. It was not until 1951, in the Durham-Humphrey Amendment, that Congress created the category of prescription drugs, i.e., drugs that are unsafe for self-medication but which can be used while under a doctor's supervision. Act of Oct. 25, 1951, 65 Stat. 648 (1951) (codified at 21 U.S.C. § 353(b)).  Only in 1962 did Congress require drug manufacturers to provide empirical evidence of the effectiveness of a drug as opposed to merely the drug's safety.

11. The Kefauver-Harris Amendments transformed drug regulation and the approval process in several respects. First, the Amendments required the FDA to review a new drug for both safety and effectiveness and specified that to demonstrate effectiveness manufacturers were required to submit data from "adequate and well-controlled investigations." 21 U.S.C. § 355(d).

## BRIEF HISTORY OF PROSTATE CANCER

12. Prostate cancer is the most common non-skin cancer in the United States and the third most common cancer worldwide. More than one million men in the United States

have prostate cancer, with an estimated 232,000 new cases of prostate cancer diagnosed each year. More than 30,000 men die each year of the disease.

13. Prostate cancer is the third most common cancer in men, globally with half a million new cases each year, almost 10% of all cancers in men.

14. One in six American men will be diagnosed with prostate cancer.

15. A man is 35% more likely to develop prostate cancer than a woman is to develop breast cancer.

16. In 2007, more than 234,000 American men will be diagnosed with prostate cancer. That's one new case every 2.25 minutes. In 2007, more than 27,000 American men will die from prostate cancer. That's one death every 19 minutes.

17. Approximately 2 million American men currently have prostate cancer.

18. A non-smoking man is more likely to develop prostate cancer than he is to develop lung/bronchus, colon, rectal, bladder, melanoma, lymphoma and kidney cancer combined.

## HISTORY OF PROVENGE

19. Provenge is manufactured by Dendreon Corporation.

20. Dendreon is at the forefront of introducing the first in a new class of active cellular immunotherapies (ACIs). The goal of active cellular immunotherapy is to turn the immune system "back on" to elicit a specific and long-lasting response against cancer.

21. Provenge is Dendreon's lead ACI candidate and is designed to treat asymptomatic, metastatic, androgen-independent prostate cancer.

22. The process uses the patient's naïve and untrained human immune system cells and through steps proprietary to Dendreon, trains those cells to re-engage the patients own immune system to fight prostate cancer.

23. The immune system is the complex group of organs and cells that defends the body against infections and other diseases. Cancer develops when cells in the body begin to grow out of control. Normal cells grow divide, and die. Instead of dying cancer cells continue to grow and form new abnormal cells. Cancer cells often travel to other parts of the body where they grow and replace normal tissue. This spreading process is called metastasis. When cancer spreads or metastasizes it is still named after the body part where it started. For example if prostate cancer spreads to the bones it is still prostate cancer, not bone cancer.

24. If approved, Provenge could fill a gap in the treatment continuum for the thousands of men with asymptomatic, metastatic androgen-independent prostate cancer. When first diagnosed with prostate cancer, most men have their prostate removed or irradiated as an initial treatment. After a period ranging from months to years prostate cancer will return in nearly all men who do not die of some other disease first. After this initial treatment failure, drugs are given to block the body's production of androgens (i.e. testosterone) as prostate cancer cells need androgens to grow. All men who do not die of some other cause first, progress to the third and final stage of prostate cancer, androgen-independent or hormone refractory prostate cancer. Androgen-independent or hormone-refractor are substantially interchangeable terms for prostate cancer cells that no longer respond to hormone

8

therapy.  <u>Provenge is intended for this patient population, a population that has already failed two different kinds of therapy</u>.

25. The treatment:  Antigen presenting cells (APCs) are obtained from the patient via leukaphresis a blood collection process that isolates a patient's white blood cells.  The patients APCs are then transported to a cell-processing center where they are co-cultured with a recombinant fusion protein containing prostatic acid phosphatase (PAP). PAP is found on prostate cancer cells and serves as the therapeutic target for Provenge. The activated, antigen-loaded APCs (now Sipuleucel–T or Provenge) are then delivered to the physician's office (infusion site) for infusion into the patient. Provenge is then infused into the patient, where it can potentially stimulate an immune system response against prostate cancer cells. The infusion is a 30-60 minute process. The process is performed 3 times over the course of a six week period, upon which treatment is completed.



26. Dendreon has completed two Phase 3 clinical trials of Provenge for the treatment of metastatic androgen-independent (hormone refractory) prostate cancer.  The results were published in the July 2006 issue of the Journal of Clinical Oncology.  Prior to

the initiation of these two Phase III trials, a Phase I and Phase II trial were completed. A third Phase III trial was completed in men who had only failed initial surgery. Two additional Phase II trials were completed in men who had failed surgery, one using Provenge alone and one using Provenge in combination with an FDA-approved anti-angiogenesis drug trade named Avastin.

27. The primary Phase III trial (D9901) demonstrated nominal statistical significance on a surrogate endpoint of time to disease progression (TTDP) at a p-value of $p=0.053$ after clerical errors were corrected. More importantly, the D9901 trial demonstrated a statistically and clinically significant advantage in survival ($p=0.01$) for patients. This survival benefit was subjected to significant secondary analyses to determine whether it was perhaps due to imbalances and chance. The company, medical experts and the FDA's own review team concluded the survival benefit was real.

28. Data from the second Phase III trial (D9902), when pooled with D9901, continued to demonstrate clinically and statistically significant survival benefits for patients who received Provenge

29. A fourth Phase III clinical trial is underway in hormone-refractory prostate cancer which will be completed in 2010.

30. The FDA believed there was enough data from the phase I, II and III trials and based on that finding of sufficient data, the FDA indicated that they could immediately evaluate Provenge.

31. Based on the established finding of the FDA that there was sufficient data for a decision, the FDA encouraged Dendreon to file a biologics license application (BLA).

32. The BLA was filed in December 2006 and the FDA granted fast track approval designation in January 2007. The date by which the FDA then had to make a decision was May 15, 2007 (the PDUFA date).

33. By law (Prescription Drug User Fee Act, or PDUFA) and according to funding regulations as well as in accordance with legal precedent, the FDA had to reach a decision on Provenge not later then the PDUFA date.

34. The FDA empanelled an advisory committee of medical experts and set the matter for committee review by the FDA's Center for Biologics Evaluation and Research (CBER), specifically CBER's Cellular Therapy and Gene Therapy (CTGT) division. CBER/CTGT previously had all the oncology drug reviews taken from them, except for review of cellular and gene therapies, and given to the Center for Drug Evaluation and Research (CDER), specifically a newly created sub-division of CR called the Office of Oncologic Drugs (OOD). This assignment of Provenge review to CBER/CTGT was consistent with a regulatory history for Provenge reaching back to the 1990's and was consistent with current FDA guidance for active cellular immunotherapies like Provenge.

35. Defendant Pazdur is the head of OOD, and the assignment of Provenge to CTGT made him angry and set off the course of events that can be explained only by calling it "political infighting" or "human nature" at a dysfunctional governmental organization.

36. OOD, being lead by led by an apparently ambitious and power seeking individual, Defendant Dr. Richard Pazdur, who thought his division should have power over all oncology immunotherapies, now and forever, (and not CBER/CTGT) wanted to

assert its power within the agency (internal power struggle) and this was the start of the power grab by Defendant Pazdur, that left Provenge, and dying patients, as the disregarded victims.

37. CTGT Director Dr. Celia Witten determined the FDA required guidance from their standing CTGT Advisory Committee on whether to approve Provenge. Witten empanelled a group of world renowned and recognized immunotherapy experts, supplemented with representatives of patients, and two oncologists placed on the advisory panel by Defendant Pazdur. One of the oncologists was Defendant Howard Scher. The CTGT Advisory Committee meeting was held on March 29, 2007, to review Provenge.

38. FDA standards hold that drugs must be safe and must demonstrate "substantial evidence of efficacy" to be eligible for marketing approval. At the CTGT Advisory Committee meeting, a series of eight (8) questions were put to the panel for review. Question #7 asked if Provenge was considered safe. The CTGT Advisory Committee members, notably including Defendant Scher, voted 17-0 that Provenge was safe. Question #8 was amended by Witten and CBER Director Dr. Jesse Goodman to reflect the standard "substantial evidence of efficacy" criteria used by the FDA. Once the question was amended, the CTGT Advisory Committee members voted 13-4 that Provenge demonstrated "substantial evidence of efficacy". This panel of experts, chosen by the FDA itself, therefore said that Provenge met the approval guidelines of safety and efficacy necessary for the FDA to approve the drug for marketing.

39. On May 9th (dubbed by the press as "Black Wednesday"), succumbing to political pressure from Defendant Pazdur and his co-conspirators, FDA commissioner Dr. von

Eschenbach did decide not to approve Provenge for immediate use and instead requested more data that might not be available until 2010.

40. The head of the FDA, Defendant Dr. von Eschenbach was in support of CBER's recommendation to approve Provenge and did himself believe Provenge should be immediately approved for marketing and distribution, instead gave in to Defendant Pazdur's demands, after Defendant Pazdur executed a successful coup d'etat.

41. By encouraging and accepting the BLA and placing it on Fast Track status the FDA had already decided it had sufficient data, which fact was confirmed at the advisory meeting by the FDA's own experts, yet the "Black Wednesday at the FDA", May 9th denial of immediate access and use of Provenge was supposedly issued because of a "lack of data" (the same data that the agency in January of 2007 said was sufficient for accelerated review).

42. This "lack of data" statement was the created and false agency excuse to deny a safe and effective immunotherapy for dying cancer patients.  The denial had nothing to do with science or for any other reason other then "politics" and "human nature".

43. Prior to the coup d'etat by Defendant Pazdur, the FDA was set to issue an approval to Provenge and had even already written the letter of approval, which letter had to be hastily edited, following the coup by Defendant Pazdur, which letter is believed to still be part of the internal records at the FDA.

44. The FDA refused to use good old fashioned common sense when it insisted on more evidence of efficacy for Provenge, when other drugs for far less serious conditions get approved without having nearly the outstanding safety and efficacy profile that was demonstrated by Provenge.

45. The FDA contradicted its own guidance by denying approval for Provenge. Guidance published by the FDA in 2005 and 2006 set out that only survival was an adequate measure for approval of drugs for hormone-refractory prostate cancer. No surrogate endpoints are considered sufficient for approval for drugs treating this disease. This guidance was confirmed at a CDER/OOD sponsored Advisory Panel meeting on July 24th, 2007 when a drug for prostate cancer was rejected because it had not yet demonstrated a survival advantage, despite demonstrating a statistically significant advantage on a surrogate endpoint. Despite this, the FDA argued during the Provenge CTGT Advisory Committee meeting and in subsequent communications that the D9901 trial failed because it did not meet a surrogate endpoint.

46. The Dysfunction at the FDA includes a complete inability of the agency to be able to conduct a proper benefit vs. risk analysis when it comes to treatments for the terminally ill, which analysis could likely be better performed and determined by a ten year old child, who actually might have some degree of common sense.

47. Inappropriately and in an effort to improperly control the advisory panel decision regarding Provenge, Defendant Pazdur selected two of the advisory panel members.

48. The two members of the advisory committee hand picked by Defendant Pazdur, including Defendant Scher, voted "no" on the issue of substantial efficacy of Provenge. These two doctors also tried to lobby others at the meeting to vote against Provenge but their efforts failed.

49. In order to try and force these two doctors onto the advisory panel the FDA had to allow them on the committee, even knowing they had severe conflicts of interests.

Both members requested and received Conflict of interest (COI) waivers from the FDA.

50. In order to circumvent patients due process rights, in a completely arbitrary and capricious manner, and in order to evade FDA regulations, two of these doctors, that Defendant Pazdur absolutely knew would not be impartial and would even be assuredly negative towards Provenge, were pushed by Defendant Pazdur onto the committee despite their disclosed conflicts of interest.

51. Contrary to US law and regulations the Defendants even allowed the Conflict of Interest (COI) experts, to vote at the advisory meeting.

52. It is unknown for certain, at this time, whether and when some or all at the FDA knew that two of the panel members had additional undisclosed conflicts of interest as well as the disclosed conflicts, or that one of these COI experts was also advising and leaking information to hedge funds, stockbrokers and others on Wall Street (Defendant Howard Scher).

53. The FDA has since repeatedly been advised of and otherwise now knows of the undisclosed conflicts of interest and yet has done nothing in response to this discovery.

54. Despite the attacks and attempts of the two COI doctors to persuade the committee to see it as Defendant Pazdur and his COI conspirators wanted it seen, during the advisory meeting, the panel, following a 5 hour meeting, still voted 17-0 that Provenge is safe and 13-4 that there is substantial evidence of efficacy.

55. Two of the four no votes came from the two special FDA employees that completed Conflict of Interests Waivers (the COI experts). By FDA regulation these conflicted consultants should not have been able to even participate, much less to vote.

56. They should have been excluded, even irrespective of their UNDISCLOSED conflicts of interest, based on the already disclosed conflicts.

57. Obviously, the conflicted doctors were two of the four "no" votes on the issue of substantial evidence of efficacy.

58. One of these "no substantial evidence of efficacy" votes came from Defendant Dr. Howard Scher, who had both disclosed and underlined undisclosed conflicts of interest which affected his decision with regards to Provenge, including payments to him by a direct competitor of Provenge.

59. Soon after Scher's anti-Provenge actions, and in concert with other Defendants including Pazdur, a direct competitor to Provenge, (NOVACEA), announced a major funding deal with drug maker Schering Plough, wherein Schering Plough agreed to jointly fund and develop the competing prostate cancer drug for which none other then the very same Defendant Howard Scher, happened to be the lead investigator.

60. This major funding deal for Scher's clinical trials would likely not have occurred if Provenge had been approved on May 15, 2007, as expected. The Novacea-Schering Plough deal was announced on May 29, 2007. The partnership of Defendant Schers Novacea, and Schering Plough, would likely not have occurred if not for the orchestrated and collective actions of Defendants wherein they did orchestrate the non-approval of Provenge, on May 9, 2007.

61. The Novacea- Schering Plough deal was worth over $500 million dollars.

62. This is but one of what may have been as many as fifteen (15) conflicts of interests that Howard Scher had, when he worked so diligently to derail Provenge, at the FDA. In other words there were at least 15 reasons for Defendant Scher to be negative towards Provenge and cause in him a desire to see that Provenge was not approved on May 15. 2007, for reasons other then the best interest of prostate cancer patients and for reasons which had nothing to do with science or any other legitimate purpose.

63. Defendant Scher's actions, taken within the FDA to benefit himself and his own political and financial interests, was without regards to the fact that he was acting as an employee and advisor of the FDA (not to mention a doctor), and when the advisory meeting did not go as anticipated, the now conspiring Pazdur and Scher then further conspired and took action outside their roles as federal employees and did use federal resources to pursue their own political agendas even outside the FDA's internal process.

64. Defendant Richard Pazdur desired a "no" recommendation from the CTGT Advisory Panel Committee and his selection and allowance of several COI panelists that would vote and pressure others as he desired, was in a direct effort to effect the outcome and was a serious denial of the due process rights of patients.

65. Prior to the vote, Defendant Pazdur and his co-conspirators tried to change the statutory question regarding substantial evidence of efficacy from "substantial" evidence, to absolute certainty of evidence in an effort to obtain a "no" vote on Provenge (this basically was an attempt to change the scientific question from a question of whether the committee was 95% certain of the effectiveness of Provenge to whether they were 100% certain that Provenge is effective).

66. Absolute proof positive 100% certainty is unattainable and has not ever been the threshold for marketing even for relatively minor medical treatments, much less for oncology drugs intended to be used as third-line therapy on dying prostate cancer sufferers.

67. This attempted manipulation by Defendants was discovered at the last moment and corrected by others at the FDA.

68. In effect Defendants tried to rewrite the FDA regulations and/or manipulate them to suit their own desired agenda.

69. Dr. Scher and Dr. Pazdur were surprised when the predetermined outcome they sought did not in fact occur, despite their efforts to sabotage Provenge. It is believed that angry hedge funds and others to whom Dr. Scher was advising (which contributed to a shorting interest in the stock of approximately 40% of the outstanding shares, to the detriment of plaintiff investors who were long the stock), then pressured Defendants to take further actions.

70. It is believed that there were even requests (pressure) exerted upon Defendant Scher to influence him to change his advisory meeting position that Provenge was safe and take further post advisory meeting actions to derail Provenge approval, by challenging the safety profile, post AC meeting.

71. Defendant Scher acceded to this pressure and did then falsely purport that, because "he couldn't sleep now", that he felt the uncontrollable need to attack publicly, and internally within the FDA, Provenge, in a manner that was not the least bit honest or sincere.

72. Defendants Schers sudden change of heart on the safety issue was completely and totally insincere, as he did not really believe that there was any real issues with regards to the safety of Provenge.

73. Defendant Scher was pressured from sources within the FDA, and outside the FDA.

74. Defendant Scher even later admitted that he did not in fact even write the anti-Provenge letter, which was leaked to the press, and that others had actually written it for him.

75. Defendant Pazdur, upset by a perceived usurpation of his carefully cultivated power and wanting desperately to regain it as soon as possible, recruited others including Defendant Scher, to act inside and outside the agency to try to influence others in the FDA, as well as the public at large.

76. The result of that effort were three letters purportedly written by three doctors (including Defendant Scher's letter), which were all written in the same general pattern and were all prepared with the improper assistance of Federal employees with help from unknown members of the medical and financial community, which letters were written with the specific purpose that they be "leaked" to the to the press by Defendants.

77. Thee FDA was still all set to approve Provenge, despite the negative PR campaign mounted and maintained by Defendants and despite the other efforts to derail Provenge approval, so further action was needed by Defendant Pazdur to assure that the approval did not go forward as planned by the FDA.

78. Due to threatened political action and demonstration by Defendant Pazdur, aided by the outside actions of Defendant Scher and the others doctors, that might politically

damage the FDA, the head of the FDA, Dr. von Eschenbach, concerned over approaching funding bills that were to be voted on by Congress, succumbed to the Pazdur threats and did announce non-approval on May 9th, several days prior to the BLA, PDUFA date of May 15, 2007.

79. The announcement and letter of the FDA that denied dying cancer patient's approval of the immunotherapy Provenge came on "Black Wednesday", a day that will go down in the annals of history, as one of the darkest of already dark days, for the prostate cancer patients that were waiting on this treatment.

80. "Black Wednesday" will also go down in history as the day the medical community came to suspect and even understand the dangers related to the current dysfunction at the FDA.

81. Two other doctors recruited by Defendants also co-conspired and helped leak the anti Provenge letters to the Press.

82. The "leaked letters" debacle was a conspiracy between Defendant Pazdur and Defendant Scher who were aided and abetted by FDA employees as well as by Dr. Maha Hussain and Dr. Thomas Flemming, who are also sometime special government employees.

83. Some of the information in Defendant Scher's letter was disingenuous and even intentionally incorrect, but still Scher was in agreement to sign off on these letters and to pass the false information on directly or indirectly to the hedge funds, and investment companies including one in which he has a financial interest in and serves as a consultant, for his own political and financial gain in violation of federal regulations and contrary to FDA regulation. Defendant Scher also contradicted his

own vote during the CTGT Advisory Committee meeting that Provenge was safe. Dr. Hussain did the same in a letter she purportedly penned to the FDA, which was also leaked to the press by Defendant Pazdur, or one of his staff.

84. It is believed that Defendant Pazdur did assist and did approve the use of FDA personnel to assist Defendant Scher in his public effort to derail the planned approval of Provenge as decided by the ODAC division of the FDA and which approval was to be signed off on by the head of the FDA Dr. von Eschenbach on May 15th 2007.

85. Defendant Scher violated federal laws and interfered with the rights of patients when he did not disclose all his conflicts of interest.

86. Defendant Scher purposefully failed to disclose all of his conflicts for fear he would not be allowed on the committee reviewing Provenge and therefore could not assist with efforts to keep Provenge from gaining approval.

87. Further "data" in phase three clinical trials is currently being collected with many patients being denied access to Provenge in the trials, and others who are in the trials are receiving a placebo (getting fake Provenge).

88. The men chosen randomly to get the placebo are still dying.

89. The men who cannot get into the trials are still dying.

90. When enough men have died, <u>more data</u> will be available for the FDA.

## CLAIMS

91. The allegations in paragraph one through ninety above are incorporated as if fully rewritten herein.

92. The Defendants, acting at a minimum in an arbitrarily and capricious manner, did intentionally and/or with wanton and willful recklessness, disregard the rights of

patients and did deny patients their right to live, in denial of the protections afforded them by the United States Constitution.

93. The FDA has no right to deny a terminal patient a safe immunotherapy for political, monetary, or any other reason, particularly when that patient's alternative is death.

94. Previous Federal Courts have ruled that the FDA denying aid to terminally ill patients is completely irrational.

95. Such FDA action serves no reasonable purpose and/or is not rationally related to a legitimate interest or goal of government.

96. The Defendants failed to follow their own regulations.

97. The Defendants have repeatedly failed to act with any consistency.

98. The FDA has no authority to deny the use of Provenge by patients in the United States of America or anyone else that has the resources outside of the United States of America, to come here to obtain a proven safe immunotherapy treatment.

99. A declaratory statement is needed to insure Dendreon Corporation that it can market and distribute Provenge to the terminally ill patients who need it, without fear of prosecution for saving the lives of these patients and also free from interference by Defendants or anyone else in government, in the best interests of patients.

100.     A declaratory statement is needed to insure that patients can receive insurance reimbursement for the cost of Provenge, just as if it was approved by the FDA.

101.     The Defendants have improperly interfered with the right of prostate cancer patients to live.

102.     The Defendants had no right to commit the tort of interfering with another persons attempt to provide aid to dying men.

103.     It is unclear if the FDA even has authority (irrational or otherwise) to regulate

immunotherapies as neither Congress, nor any other government authority has

specifically given them the authority over immunotherapies of this kind, by statute,

by regulation, or otherwise.

104.     It is undisputed by the FDA that there is no addictive quality to Provenge, no

potential for abuse, and it is safe.  The FDA's own expert Advisory Committee,

including Defendant Scher, voted 17-0 that the three Phase III trials, three Phase II

trials, one Phase I trial, and blinded data from the fourth ongoing Phase III trial were

sufficient to demonstrate Provenge is safe.

105.     The FDA's own expert Advisory Committee voted 13-4 that the three Phase

III trials, three Phase II trials, one Phase I trial, and blinded data from the fourth

Phase III trial were sufficient to demonstrate "substantial efficacy" , the FDA's own

threshold for approval.

106.     The immunotherapy is designed for each particular patient and is designed to

stimulate ones own immune system to fight cancer.

107.     Historically, there has never been an immunotherapy approved for use by the

terminally ill by the FDA, and they may be without regulatory authority to deny

dying patients such treatments.

108.     There is no history or tradition with regards to immunotherapy regulation.

109.     Provenge technically is no longer a "new" therapy (or even a drug,) and even

our history for more quantifiable drug regulation is not so clear.  Our Nation's history,

legal traditions, and practices, in this regards, is that the government has not blocked

access to new drugs throughout the greater part of our Nation's history. Only in recent

years has the government injected itself into consideration of the effectiveness of new drugs. The Food, Drug, and Cosmetic Act ("FDCA"), Pub.L. No. 75-717, §§ 1-902, **394 *473 52 Stat. 1040 (1938) (codified as amended at 21 U.S.C. § 301 et seq. (2000)), prohibits drug manufacturers from introducing any "<u>new drug</u>" into interstate commerce until manufacturers have applied for, and received, FDA approval. 21 U.S.C. § 355(a). "A "new drug" is any substance covered by the FDCA <u>not</u> <u>"generally recognized, among experts ... as safe and effective for use under the</u> <u>conditions prescribed</u> ... in the labeling." 21 U.S.C. § 321(p)(1). Before a new drug is eligible for full approval and marketing, the Secretary of the U.S. Department of Health and Human Services must find "substantial evidence that the drug will have the effect it purports or is represented to have." 21 U.S.C. § 355(d). Exempted from this general ban are new drugs "intended solely for investigational use by experts ...." Id. § 355(i)(1). Amazingly, Provenge is already generally recognized by experts, even the FDA's own experts, to be safe and effective.

110.    There is no rational basis or legitimate government purpose in denying terminal patients a clearly safe immunotherapy even if the FDA is only 95% certain that it works.

111.    Provenge also was determined by a near majority (almost all of the non-COI experts) to be effective.  It is also believed that one of those previous "no" votes by one of only two non conflicted in the minority, may change their vote, if the panel was reconvened, as that advisory committee member was apparently confused by the change in the question as first presented (as attempted by the Pazdur conspirators).

112.    One needs to look no further then the FDA's very own experts who have already recognized Provenge as being safe and effective to a degree of 95% certainty, to determine that Provenge is widely accepted by health professionals, and as such is absolutely and undeniably unique, in that it has attained the status of a widely accepted immunotherapy in the medical community even without approval by the FDA.

113.    Because of wrongdoings, improper conduct, illegalities and inappropriate actions by Defendants, the Department of Health and Human services has not, properly free from improper influence and bias; been provided a chance to properly approve Provenge. Because of the Defendants illegal and improper actions and inactions the immediate use of Provenge has been denied to the patients that need it.

114.    The Department of Health and Human Services has not properly supervised the rogue actions of the Defendants.

115.    The current trials are double blinded and many of the current participants are being given a placebo which denies them the benefits of Provenge now. The trials are double blinded by order of the FDA.

116.    It is truly unconscionable that there are terminally ill men who could be helped but yet are receiving a placebo in trials.

117.    The right of control over one's body has deep roots in the common law. The venerable commentator on the common law William Blackstone wrote that the right to "personal security" includes "a person's legal and uninterrupted enjoyment of his life, his limbs, his body, [and] his health," as well as "the preservation of a man's health from such practices as may prejudice or annoy it." WILLIAM

25

BLACKSTONE, 1 COMMENTARIES *125, *130. This right included the right to self-defense and the right to self-preservation. "For whatever is done by a man, to save either life or member, is looked upon as done upon the highest necessity and compulsion. As recognized throughout Anglo-American history and law, when a person is faced with death, necessity often warrants extraordinary measures not otherwise justified. Indeed the principle holds even when that action impinges upon the rights of others. ("This doctrine of necessity applies with special force to the preservation of human life").

118.     Such a bar puts the Defendants in the position of interfering with efforts of others that could save a terminally ill patient's life. Although the common law imposes no general duty to rescue or to preserve a life, it does create liability for interfering with such efforts. Section 326 of the Restatement (First) of Torts, first published in 1934.

119.     The Defendants, assisted by others known and unknown have, without privilege to do so, intentionally prevented those dying from prostate cancer a chance to live as they have not given them available aid necessary to the patients bodily security and have interfered with others attempts to do so and thus are liable for the bodily harm caused to them by the absence of the aid of Provenge, which is a proven and known aid and which wants to be given to aid those persons by a third person (Dendreon).

120.     While infrequently invoked, this common law rule is of venerable vintage.

121.     Defendants did exceed the scope of their employment and took action for their own monetary and political gain to the detriment of patients and with a complete lack

of concern for dying cancer patients and by taking other actions to ensure that prostate cancer sufferers would be denied access to Provenge.

122.    For his own personal benefit and gain, Defendants did ignore the rights of patients and serve to commit the tort of interference with aid to dying patients.

123.    Due to illegal manipulation by Defendant Pazdur, in conspiracy with others, the CTGT Advisory Committee could and should be ordered immediately reconvened with the same advisors less any advisors with any conflicts of interest.

124.    The same expert panel if ordered reconvened by this court, without anyone with conflicts of interest participating, would very likely be 17-0 on safety and either 15-2 or better, on the issue of substantial efficacy. We are talking about a treatment that is to be used only on those dying of prostate cancer. The utter insanity and irrationality demonstrated by the FDA in this matter is inconceivable and would not be believed even in a fiction book yet it has occurred.

125.    Provenge is not a treatment that should be judged the same as other types of treatments. It is a treatment for those that are terminally ill, who have no other treatment options.

126.    Even if this court fashioned a general remedy that orders an immediate reconsideration of Provenge by the FDA and that the decision is not allowed to be arbitrary and capricious or based on politics, power, money, or undue influence of others then Provenge would be approved on FDA reconsideration.

127.    The FDA and the Department of Health and Human services acted arbitrarily and capriciously in regards to the decision of the FDA to deny dying patients access to an immunotherapy that might save their lives and a declaratory judgment is proper.

128.     Alternatively a declaratory judgment that unequivocally declares that Provenge is not a "new drug" and that it did not or at least no longer requires FDA approval to be marketed and distributed in the United States of America.

129.     Provenge is not a narcotic and cannot be misused or over used.

130.     There are thousands of experts in the field, including the 17 members of the FDA's own advisory committee that can testify as to the safety and efficacy of Provenge and that it is an immunotherapy widely accepted by the medical community and thus not "new' as the word "new" is defined by federal regulation.

131.     Provenge should be declared an immunotherapy that has cleared and otherwise achieved all reasonable, rational and commonsensical hurdles and may used and recognized for use by dying prostate cancer patients and thus it is irrational to allow a government agency to further control it and/or deny it to patients.

132.     The FDA collectively (without fear of Defendant Pazdur) believes Provenge is safe and effective but its immediate use was denied by the FDA due to ulterior motives and due to improper and unlawful pressure and other acts of Defendant Pazdur and his co-conspirators.

133.     Provenge should also be declared not to be "new" because it has been around for nearly a decade, and has completed Phase III, Phase II, Phase I and is well on its way through a fourth Phase III trial that was blinded by the FDA and as it is widely accepted as safe and effective by the medical community.  It is not a new drug, rather it is an immunotherapy recognized by doctors including but not limited to Plaintiffs, oncologists, urologists, immunotherapists, biotech experts, and others in the medical community as safe and effective.

134.     Doctors want Provenge for their patients NOW, patients want Provenge NOW, families of patients want Provenge for their family NOW. Plaintiffs want to help get it to the patients NOW.

135.     If patients had the right to make their own informed choice after Provenge was explained to them from their Doctor, most all would choose Provenge over absolute imminent death and/or debilitating chemotherapy followed by death.


## PETITIONS AND ADVOCACY EFFORTS FOR PROVENGE ADVOCACY PRIOR TO INVOLVING THIS COURT

136.     Plaintiff incorporates paragraphs one through one hundred thirty five above as if fully rewritten herein.

137.     This case is absolutely without precedent in that there has never been such an incredible, irrational and unjustifiable denial of the rights of dying patients by such a dysfunctional agency.

138.     The uproar and anger demonstrated by the public, doctors, experts, oncologists, urologists and others over the FDA denial of immediate access to a proven safe immunotherapy to doctors and their patients is unprecedented.

139.     The medical community wants this treatment option now. Patients want it now. Any delay costs lives. There is not legitimate government interest in delaying its use.

140.     Plaintiffs, joined by advocates and other Provenge supporters have faxed, e-mailed, sent correspondence to and called the FDA, congress, senators, justice departments (DOJ), SEC, and others and have tried every imaginable advocacy action to right the injustice that was the Black Wednesday denial of Provenge, but they have

been met with a complete lack of reason, justification, answers and a refusal of the

FDA or any other governmental agency to be responsive.  The Legislative and

Executive branch of the federal government has been completely unresponsive and

downright inept.

141.      This court is the last hope of those dying NOW because the legislative and

executive branches of government refuse to help the dying patients and are unable to

function with any level of Democracy.

142.      Plaintiffs, as well as numerous other Provenge supporters have faxed, e-

mailed, signed and sent letters and petitions to the FDA and have called and written

letters to the FDA, but have been met with incompetence and inaction.

143.      Plaintiffs, as well as other Provenge/Patient Rights groups, supporters, and

patient advocates have even recently run the advertisement attached hereto as

"Exhibit A", which call for reconsideration ran in the Washington Post on July 15th

2007, asking the federal government to reconsider its position on Provenge.  It was

again met with no response from the FDA, Department of Health and Human

Services or any other government authority.

144.      Plaintiffs have no real timely remedy other then this court.

145.      On June 4th 2007, Plaintiffs and patient advocates for Provenge even met with

FDA commissioner Andrew von Eschenbach requesting that he reconsider his

decision to deny immediate approval for Provenge.  Dr. von Eschenbach responded

with "talk to CDER", an internal political division of the FDA.  (Note: The statement

was indicative and was in reference to the interference by Defendant Pazdur since

CBER, and not CDER, was assigned to review Provenge.  If indeed CDER, and

specifically Defendant Pazdur's OOD was involved in the rejection of Provenge, then the FDA did not follow its own rules by not allowing CBER/CTGT to make the approval decisions<u>). FDA commissioner Dr. von Eschenbach also specifically denied reconsideration of the Provenge matter when the Plaintiffs requested it</u>. Dr. von Eschenbach, by agreeing to meet with the Plaintiffs herein, and discussing the matter with them, did effectively by listening and responding that there would be no reconsideration, placed the FDA stamp of approval on and did otherwise obviate, waive and make unnecessary further redundant requests by Plaintiffs for reconsideration of the matter. Dr. von Eschenbach essentially accepted a verbal petition to the FDA for reconsideration, which he then denied.

146.　　Dr. Von Eschelman will state that it was political pressure applied by Defendant Pazdur and/or CDER/OOD, Defendant Pazdur's pressure on FDA employees, combined with his own concerns over funding and other bills before Congress, which contributed to the agency decision to deny Provenge.

147.　　After von Eschelman's discussion with the advocates, CDER and CBER were contacted and they put the blame for the decision on the COI's (conflict of interest doctors on the advisory committee), yet nobody within the FDA will agree to amend the voting records to properly reflect the votes, after disqualifying the votes of the COI doctors that were not qualified to participate in the advisory meeting and/or to vote therein.

148.　　Many of the Plaintiffs herein signed a petition, which was also sent to the FDA requesting reconsideration. Again the FDA refused the petition.

149.     Yet another petition, attached hereto as ("Exhibit B") was recently filed by Plaintiffs asking the FDA to reconsider, and to date there has been no response.

150.     Plaintiffs and other advocates have made <u>tens of thousands</u> of requests to the government to right the FDA injustice, on behalf of the patients.

151.     The FDA itself has failed to take action responsive to the many thousands of requests they have received by Plaintiffs and others combined.

152.     Other administrative remedies are meaningless and are essentially unavailable because there is no control of the FDA as it is government run amuck.

153.     Other administrative remedies are illusionary and do not really exist beyond what has already occurred in this unusual and unprecedented case.

154.     Agency dysfunction renders the petition process to be a complete useless waste of time and resource by those that are dying and do not have the luxury of time.

155.     Additional administrative remedies are not available because of the condition of the patients who need Provenge. They are dying every day. Tomorrow another patient's remedy will be exhausted by his own death.

156.     Abigail Alliance, a patient advocacy group, also filed a petition on behalf of patients asking for earlier access to drugs such as Provenge for the terminally ill on June 11 2003, and they have yet to receive a response from the FDA.

157.     Numerous other citizen petitions have been filed by groups like the Abigail Alliance, with the FDA, asking for similar relief and the FDA has been completely and repeatedly unresponsive. It is a waste of time, that dying patients do not have, to seek further redress by an out of control and dysfunctional FDA. The FDA has

proven by their consistent and repeated non-responsiveness that the due process is illusionary

158.    The so called "due process" set up by the agency in order to try to make them complaint (litigation) proof, is a farce and nothing more then a deprivation of the Constitutional Due Process rights of the patients.

159.    Repeatedly, over and over the FDA has proven that any petition effort is a completely futile action.

160.    Title 21 (citizen petitions) is unconstitutional both in general and as applied to cases of this sort, where immediate action by the courts is required or people will die. All and or portions of Title 21 were not reasonably written and narrowly tailored for a legitimate governmental purpose and serves only to further destroy the due process rights of patients. This is particularly true as applied to the facts of this particular case.

161.    If patients die waiting on what has historically been a complete lack of responses from the FDA then they were deprived of any remedy at all.

162.    It's an absolute that the patients do not have the luxury of time.

163.    The FDA is currently dysfunctional and the Department of Health and Human Services is unable to control it.

164.    Provenge is a treatment for the terminally ill and the same rules that apply to other types treatments should not be used or be judged the same as other unnecessary type of treatments.  It is a treatment for those that are terminally ill who have no other treatment options.

## REQUEST FOR EMERGENCY TEMPORARY AND PERMANENT INJUNCTIVE RELIEF

165.    The Plaintiffs incorporate the above paragraphs one through one hundred sixty-four above as if completely written herein.

166.    Irreparable and immediate harm will be caused and many terminally ill androgen independent cancer patients will die because they have been improperly denied access to the immunotherapy Provenge, which drug is UNDENIABLY SAFE (shockingly, the FDA must stipulate to this safety profile as did their panel in a 17-0 vote).

167.    Because of the inappropriate actions taken within and outside the FDA, by Defendants, an immediate emergency injunctive order should issue that enjoins the FDA from blocking in any way the immediate marketing and distribution to Provenge to the patients, as they have no other reasonable treatment options.

168.    The failure of this court to act on an emergency basis and correct the manifest injustice caused by the actions of the FDA and others who acted in concert and conspiracy with the FDA, including, could result in the deterioration of life and the deaths of as many as 60,000 terminally ill patients.

169.    This extraordinary emergency injunctive action is proper because this is an extra ordinary case that is without any precedent within the history of this country.

170.    The actions of the Defendants have placed a black mark on the integrity of our government and caused the medical community at large to lose what little faith that remained that the FDA can function as a legitimate and rational government entity.

171.    Based upon the demands of personal dignity and autonomy, when human life depends upon medical decision making and the FDA not only acts arbitrarily and capriciously with regards to our fundamental right to chose to live, then this court can and should take immediate emergency action and enjoin the FDA from blocking the marketing and distribution of Provenge.

172.    This court must take extraordinary action based on an extra ordinary set of circumstances that has occurred within our government

173.    The FDA actions are without administrative precedent and are costing lives every day.

174.    FDA actions in this regard are arbitrary, capricious and inconsistent as demonstrated on July 24, 2007, when an OOD Advisory Committee, controlled by Defendant Pazdur, rejected a different prostate cancer drug because there was no survival advantage shown, even though a surrogate endpoint was positive. Provenge was purportedly rejected because a surrogate endpoint was negative, despite showing a clinically and statistically significant survival advantage.

175.    The intentional wanton, willful and malicious obstruction by the FDA, for monetary and political reasons which is estimated will cost the lives of 60,000 men is due to actions from those within the FDA who acted both within and outside the scope of their employment and were assisted by outside co-conspirators.

176.    Provenge is an immunotherapy that is for use only on androgen independent prostate cancer sufferers that otherwise have a terminal diagnosis.

177.    Provenge has passed muster from the FDA in several ways and an immediate injunction order should issue as injunctive relief is easily provable at an injunction

hearing based on the FDA's own internal evidence which indicates: Provenge was approved to conduct Phase One testing, then approved for Phases II testing and then approved for Phase III testing., then approved for another Phase III trial (which was double blinded by the FDA.   That data was then recognized by the FDA as sufficient for fast track approval, approved by an FDA advisory panel but then denied only due to improper actions of Defendants. There is ongoing trials that are being conducted but an undeniably safe immunotherapy that has been requested for and by dying patients goes unused.  This is an easily provable emergency.

178.      Despite requests to the FDA and post non-approval disclosure of the undisclosed Scher conflicts to the FDA, the FDA still refuses to amend the voting records to remove Scher's "no" vote on the substantial efficacy question.

179.      Even at the advisory meeting itself Defendant Pazdur tried to direct Dr. Hussain on how to orchestrate the hearing to initiate more anti Provenge discussion, which written notes are in the possession of Dr. Hussain.

180.      The National Cancer Institute recently criticized the dysfunction at the FDA when they suggested that the manner in which the FDA evaluates treatments for the terminally ill are unreasonable and should change and have suggested that the new era of scientific discoveries cannot be judged by age old scientific notions.

181.      A dozen experts including a former FDA Chief as well as Doctors from The National Cancer Institute can be available to testify at an emergency injunctive hearing and will state that the decision to deny approval to Provenge was arbitrary and capricious and not in the best interests of dying cancer patients.  These experts (the injunctive relief request can be proven by Plaintiffs with hardly any more effort

then bringing in the CBER/CTGT's own employees and experts as <u>they agree</u>

Provenge should have been approved) can also testify that the FDA is an antiquated

and dysfunctional agency not well equipped to be evaluating biologics, and that new

standards must be used to evaluate treatments and that the agency has demonstrated

an inability to use good old fashioned common sense, since Provenge is safe and has

been proven substantially effective and that the safety versus benefit profile has to be

considered in light of the condition of the <u>dying patients</u> and their lack of other

options.

182.    A third party, Dendreon, has offered aid to dying patients with no alternative

and the Defendants have conspired to block that aid in violation of common law.

183.    Provenge patients have no alternative treatment options and thus the

Defendants must be enjoined from interfering with aid to them by third persons who

want to provide that aid.

184.    Provenge can save lives but politics, greed and "human nature" have instead

combined so as to cause men to continue to die when they can be saved.

185.    The refusal to approve Provenge means men will die sooner and with less

quality of life then they would if they were given immediate access to Provenge.

186.    Based on the FDA's own employees and experts and the Plaintiffs additional

lay and expert witnesses, there is a substantial likelihood that Plaintiffs will prevail on

the merits of this action as the movant, includes doctors and their patients, families of

patients as well as past and future prostate cancer patients will suffer irreparable

injury if an injunction is not granted.  The issuance of a preliminary injunction would

not cause substantial harm to any other interested party and the public will be served by the issuance of the injunction.

187.    This is an emergency as someone dies everyday of Prostate cancer.

188.    Because the FDA's denial of Provenge has resulted in Dendreon Corporation having to suspend work on related immunotherapy treatments for ovarian cancer, breast cancer and other cancers, the effect of the blocking of the treatments is even more widespread and damaging to patients with different kinds of cancer then is generally known.

189.    Defendants, including Dr. Scher and Dr. Pazdur were negligent in their treatment of prostate cancer patients.

190.    Defendants Scher and Pazur are Doctors and thus owe patients a duty in their capacity as both Doctors and as government employees charged with watching out for the best interests of patients.

191.    Defendants breached the duty owed all cancer patients.

192.    Plaintiffs were damaged by the breach of duty by Plaintiffs.


WHERFORE, Plaintiffs seek an emergency temporary and permanent injunctive order from the court, as well as declaratory judgment that the FDA did arbitrarily and capriciously deny dying and terminally ill patients access to a safe immunotherapy without due process of law, and in violation of their right to personal dignity and autonomy, being that prostate cancer patients have an absolute constitutional and common law right to fight for their lives by having access to an undeniably safe immunotherapy and further assert that the Defendants have violated the laws of the Unites States as well as Federal Regulations and

is acting dysfunctional and seek immediate emergency injunctive relief that does some or all or the following conjunctively or alternatively:

A) Enjoin the FDA from denying the marketing and sale of Provenge to androgen-independent prostate cancer patients.

B) In accordance with established United States Common Law, Plaintiffs seek to enjoin the Defendants from denying immediate access to Provenge and ask that all Defendants collectively and individually be restrained and ordered to cease and desist their interference with Dendreon's lawful attempts to provide aid to dying patients by marketing and distributing Provenge.

C) A declaration that the FDA's failure to approve Provenge was due to the failure of the FDA to follow its own regulations combined with the improper actions taken by Dr. Howard Scher, and Dr Richard Pazdur that improperly corrupted the process and influenced the decision not to approve Provenge on May 15th 2007.

D) A directive of the FDA to immediately approve Provenge and/or to reconvene the same CBER panel without the influence and voting of the COI panelists who were previously improperly permitted to participate and were influenced and controlled by improper duress by Defendant Pazdur.

E) Issue an order to the FDA to amend its advisory panel voting records to invalidate the votes of the doctors who had conflicts of interest both disclosed and undisclosed.

F) Order that Defendant Richard Pazdur and Howard Scher be enjoined and restrained from playing any part in a reconsideration of immediate approval of Provenge, privately or publicly and be further restrained from influencing others at the agency who want to do their job without fear of reprisal from them.

G) Declare that due process was denied and the process was corrupted by Dr. Richard Pazdur and/or Howard Scher, which improper actions served to deny Plaintiffs right to due process of law and that the May 9th decision of the FDA was arbitrary and capricious.

H) Enjoin the continuing denial of access to Provenge by the FDA for terminally ill members and prostate cancer patients in the United States of America as an individual must be free to decide for himself with the counsel of his doctor whether to assume any known or unknown risks of taking a medication that might provide their only real chance at prolonging their life.

I) Declare that the FDA is without authority to deny immediate access to Provenge as it is no longer a "new drug" as statutorily defined, or that because of the unique nature of this case, that Provenge no longer needs approval to be marketed and distributed because it has attained the appropriate stature in the medical community to be marketed and distributed without further approval.

J) Declare that the FDA cannot interfere with its marketing, sale and use, absent additional findings or tests results that indicate any further safety concerns.

K) Declare that due process was denied the patients.

L) That Defendants as doctors and as federal employees were negligent towards cancer patients.

M) That the Defendants improperly denied available aid to dying patients and are liable for any injuries caused to them

N) Any other relief this court deems appropriate under law or equity as well as costs of this action.

Respectfully submitted,

S/Kerry M. Donahue

_____
Kerry M. Donahue          (0061105)
TRIAL ATTORNEY
*BELLINGER & DONAHUE*
6295 Emerald Parkway
Dublin, Ohio 43016
Telephone: (614) 761-0402
Facsimile: (614) 789-9866

EXHIBIT A

EXHIBIT B



**{Waterview Residences}** - Boutique con
waterfront in Rosslyn Va. www.waterviewResidences

connect. share. profit.
Ads by Google

| Message Boards | Preferences | About Us | Home | Sign In | Find | Message Board | For [Symbol] |
|---|---|---|---|---|---|---|---|

## DNDN (Dendreon Corp)    591 members / 1237 guests (last 24 hrs)



Yahoo    Raging Bull    DNDN Homepage    Dendreon Old Guard

| **Message Board** | SEC Filings | News | Quote / Chart | Links | Guess Today's Hi, Lo & Close |
|---|---|---|---|---|---|

Return to Message List    Top of Message List                    Search  Message #          For

◁  ▷    [ Post Message ]    [ Reply ]    [ View Thread ]    [ My Ignore List ]        Google

Msg: 149258 of 150661    8/8/2007 11:04:06 PM    Recs: 139    **Sentiment:** Not Disclosed

By: KDDublin    Send PM    Profile    Ignore    Recommend    Add To Favorites

### Progress

In an attempt to avoid service of process from today from Plaintiff CareToLive Kirsten and
Paul Goldberg left town today.

AS the Washington Post said: "in the basement of a house in a tree-shaded Northwest
Washington neighborhood from which Goldberg and his wife, Kirsten Boyd Goldberg, publish
a newsletter ............"

The true story of the pleaseant tree lined street:

The investigator hired by CareToLive while conducting surveillance on the Goldberg's home
(which doubles as their basement office) was approached by the next door neighbor in this
pleasant little tree shaded street where the Goldberg's home/basement office is located,
(these next door neighbors presumably having been advised by the Goldberg's that here
were PI's in the area attempting to serve legal process upon them). Well the nice lady that
lives next door in this nice little tree lined neighborhood did proceed to call the CareToLive
investigator a "mother f_____! I am not sure which finishing school in Washington DC
she learned such language, but it is I guess beside the point.

Last night the Goldberg's hid in their basement and refused to answer their door to accept
CareToLive subpoenas. Today they left town in order to avoid further service (their counsel
already acknowledged receipt of faxed subpoenas in this matter). Today they were served by
personal process service on their household to a person over age 18.

The Goldberg's thought they escaped town and avoided legal process.

WRONG!

Apparently their father Boris Goldberg lives with Paul and Kirsten (a household occupant
over 18 years of age who can accept service). Our investigator followed Boris as he left the
house tonight and he went to a restaurant. When Boris returned home to the Goldberg
home/office, where he lives, our investigator said "Hi Boris". Boris responded with a "hello".

The CareToLive Investigator then served Boris. At that time panic set in with Boris and he
said "I am not Boris and I do not live here". (as Joey would say heh, heh, heh.) Apparently
the Goldberg family is full of three generations of liars. The process server then informed
Boris Goldberg that he saw him leave the house earlier, meet others and go out to dinner

and then saw him return to his home and served him upon his return home. Boris was then quite speechless.
The investigator got a good laugh out of the laughable attempt by Boris to say that he was not Boris and did not live there (third party sources have confirmed that grandpa Boris does live there).

CareTo Live members. We continue the fight for justice and FDA reform.

Ads by Google

**LendingTree - Loans**
Get $425K for $1,367/Month, for Only $294/M
www.LendingTree.c

**Bear Market B**
Slope of Hope:
view of U.S. ma
bearish bent
www.SlopeOfHope.

**Stock Market**
Analyze The M
The Pros w/ O
Services. Sign
www.StockCharts.c

**Stocks at TD AMERITRADE**
Commission fre
45 days. No ma
fees. Sign up n
TDAMERITRADE.c

**Hot Stock Ale**
Ethanol, Biofue
Energy Gulf Etl
(OTC:GFET)
www.GulfEthanolCo

📧 Email this page to a friend                    **Report Abuse**

◁  ▷   **Post Message**   **Reply**   Return to Msg List   Top of Msg List

Refinance as low as 5.9%

**Replies to this Message:**

| Msg # | Subject | Author | Recs | Date Posted |
|---|---|---|---|---|
| 149259 | Re: Progress | sriccio | 39 | 8/8/2007 11:07:32 PM |
| 149260 | Re: Progress | optimistic skeptic | 6 | 8/8/2007 11:09:50 PM |
| 149261 | Re: Progress | gofishmarko | 3 | 8/8/2007 11:10:52 PM |
| 149262 | Re: Progress/Oh what web we weave!!!! EOM | cben | 4 | 8/8/2007 11:16:41 PM |
| 149263 | Re: Progress | Thestiek | 38 | 8/8/2007 11:21:03 PM |
| 149268 | Re: Progress | orion_gambler | | 8/8/2007 11:41:57 PM |
| 149273 | Re: Progress / & KGB | jerzee | | 8/9/2007 5:05:38 AM |
| 149273 | Re: Progress / & KGB | jerzee | 5 | 8/9/2007 5:16:50 AM |
| 149285 | Re: Progress | renoir | 3 | 8/9/2007 7:44:19 AM |
| 149291 | Re: Progress......Priceless! | nfld_watchdog | 3 | 8/9/2007 8:56:03 AM |
| 149294 | Re: Progress | DeadCatBounce | | 8/9/2007 9:08:27 AM |

MARKETPLACE

 **FISHER** INVESTMENTS   optionshouse

© 2003-2007 InvestorVillage.com All Rights Reserved. Please read the **User Agreement. - Contact Us - About Us**

Financial Market Data powered by Quotemedia.com. All rights reserved. View the Terms of Use.
NYSE/AMEX data delayed 20 minutes. NASDAQ and other data delayed 15 minutes unless indicated

- Anonymous Tips
- RSS Feed
- Subscribe via e-mail

**Pharmalot**

News, Comment and Conversation



« FDA Nixes Wyeth Schizophrenia Drug
Lilly Vows To Disclose Global Contributions »

# Provenge And The Private Eye

August 10th, 2007 10:44 am By Ed Silverman

There's nothing like the Provenge controversy to generate interesting tales. For those who don't recall, Provenge is a prostate-cancer vaccine developed by Dendreon, and was recommended by an FDA panel last spring. But approval was unexpectedly delayed by the agency after two dissenting panel members wrote the FDA commish to think twice.

That set off a firestorm - threats and charges of conflicts of interest against the two panel members; protests by cancer patients; angry Internet missives by investors and, most recently, a lawsuit against the FDA filed by a newly formed non-profit called Care To Live, which appears to have been created specifically for this battle.

Now, the attorney who filed the lawsuit has posted details of how his private investigator stalked Paul Goldberg, who broke the story of how panel member Howard Scher wrote the FDA to delay Provenge approval. Goldberg publishes The Cancer Letter from his Washington, DC, home with his wife, Kirsten, who's the publisher. The non-profit wants to know how Goldberg got the letter.

Two days ago, attorney Kerry Donahue took the unusual step of writing on the Investor Village web site: "Last night, the Goldbergs hid in their basement and refused to answer their door to accept CareToLive subpoenas. Today, they left town…

…in order to avoid further service (their counsel already acknowledged receipt of faxed subpoenas in

this matter). Today they were served by personal process service on their household to a person over age 18. The Goldbergs thought they escaped town and avoided legal process. WRONG!

Apparently, their father, Boris Goldberg, lives with Paul and Kirsten (a household occupant over 18 years of age who can accept service). Our investigator followed Boris as he left the house tonight and he went to a restaurant. When Boris returned home to the Goldberg home/office, where he lives, our investigator said, "Hi Boris". Boris responded with a 'hello'.

The CareToLive Investigator then served Boris. At that time, panic set in with Boris and he said. 'I am not Boris and I do not live here.'…The investigator got a good laugh out of the laughable attempt by Boris to say that he was not Boris and did not live there (third party sources have confirmed that grandpa Boris does live there)."

And why did Donohue post this? "The litigation is going to be expensive and needs to be funded," he tells Pharmalot. "Everybody wants info. Something that has some excitement may encourage people to put some money up. This might help Care To Live raise more funding."

Goldberg, so far, hasn't returned messages left at his office or on his cell phone.

Tags: Care To Live, Dendreon, Provenge

- Share / E-mail
- Sphere it
- 
- Trackback
- Permalink

**Sponsored links**

? Gain a new perspective on metro living @ HENLEY ON HUDSON
CHILTON MEMORIAL HOSPITAL-FREE SLEEP HEALTH SCREENINGS-1-888-CHILTON-OPTION 7
You can follow any responses to this entry through the RSS feed.
You can leave a response, or trackback from your own site.

# 11 Responses

1. 
   August 10th, 2007 at 1:07 pm

   **phil vardena**

   Hi Ed Silverman,
   thank you for your nice job regarding Provenge.

   I think you smell something, just like I do.

   Those doctors that "leaked" letters (urging the FDA NOT to approve Provenge) to The Cancer